**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **CITIFINANCIAL MORTGAGE** | ) | |
| **COMPANY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 06-CV-160-TCK-PJC** |
| | ) | |
| **KAREN FRASURE and ALBERT** | ) | |
| **FLEMING,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**OPINION AND ORDER**</u>

Before the Court are Plaintiff CitiFinancial Mortgage Company, Inc.'s ("CitiFinancial")

Motion for Summary Judgment ("Motion for Summary Judgment on Loans") (Doc. 47) and Motion

for Summary Judgment Dismissing Defendants' Counterclaims ("Motion for Summary Judgment

on Counterclaims") (Doc. 72).[1]  At issue in this case are three loans made from Associates Financial

Services Company of Oklahoma, Inc. ("Associates") to Defendant Albert Fleming ("Fleming").

Defendant Karen Frasure ("Frasure") was a co-signer on all three loans.  CitiFinancial, successor

in interest to Associates, has sued to recover the outstanding balance, plus interest and fees, on the

three loans.  Defendants, appearing pro se, have asserted counterclaims for intentional infliction of

emotional distress, defamation, false light invasion of privacy, fraud, trespass, and embezzlement.

---

[1]  On December 18, 2006, Magistrate Judge Paul Cleary granted Defendants' motion to amend their Answer and assert counterclaims against CitiFinancial.  (*See* Doc. 63.)  To avoid prejudice to CitiFinancial, Judge Cleary allowed CitiFinancial to file a dispositive motion on the counterclaims.  (*See id.*)

## I.  Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted).  The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* (citation omitted).  The party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in the complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

## II.  Treatment of Pro Se Pleadings

"A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  "[I]f the court can reasonably read the pleadings to state a valid claim on which [a pro se litigant] could prevail, it should do so despite the [litigant's] failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Id.*  In contrast, with respect to factual assertions, a pro se litigant "requires no special training to recount the facts surrounding his alleged injury, and he must provide such facts if the court is to determine whether he makes out a claim on which relief can be granted." *Hall*, 935 F.2d at 1110.  Further, at the summary judgment stage, a pro se litigant must present "the type of evidence enumerated in Rule 56 to establish the elements of his case." *McGee v. Hayes*, 43 Fed. Appx. 214, 216 (10th Cir. 2002) (unpublished); *see also Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1216 (10th Cir. 2004) (affirming summary judgment in light of

evidence presented because "[j]ury verdicts may not be based on speculation or inadmissible evidence or be contrary to uncontested admissible evidence"). The Tenth Circuit has also instructed that a district court "cannot take on the responsibility of serving as the [pro se] litigant's attorney in constructing arguments and searching the record." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005).

## III.    Defendants' Exhibits

In this case, Defendant Frasure has prepared all pleadings and exhibits on behalf of her and Fleming.  In response to both Motions for Summary Judgment, Frasure has submitted numbered statements of disputed facts, labeled exhibits, and comprehensive indices of such exhibits.  (*See* Defs.' Response Briefs, Docs. 85, 94.)  The set of Defendants' exhibits referenced by the Court in this Order is the set submitted in support of Defendants' Response to Motion for Summary Judgment on Counterclaims.  (*See* Doc. 86.)[2]  Some "disputed" facts are supported with citation to the attached exhibits while others are not.[3]  In support of their pleadings and attached exhibits, Fleming and Frasure submitted affidavits stating that "all documents are true and correct according to my testimony stated accordingly" and that "all documentation that I have submitted, concerning all Exhibit's presented, is true and correct to the best of my knowledge and understanding."  (*See* Docs.

---

[2] The exhibits comprising Document 86 consist of 12 groups of documents labeled A-L.  The exhibits are labeled with a  letter and a page number – *e.g.*, A,1.  With respect to Groups J-L, there is another identifying letter after the page number – *e.g.*, J,1A.  The Court's references to Defendants' exhibits are by letter and page number.  The exhibits supporting Defendants' Response to Motion for Summary Judgment on Loans are identical to those contained in Document 86, except they do not include Groups J-L.  (*See* Doc. 96.)

[3] With respect to the Motion for Summary Judgment on Loans, CitiFinancial has provided a chart outlining Defendants' responses to CitiFinancial's Statement of Facts.  (*See* Reply in Support of Mot. for Summ. J. on Loans, Ex. J.)

88, 89, 109, 110.)

In their Reply briefs, CitiFinancial argues that summary judgment is warranted because Defendants have not presented evidence the Court can properly consider. Specifically, CitiFinancial contends the Court may not rely on any of Defendants' exhibits because they are not sufficiently supported by affidavits and because Defendants lack personal knowledge regarding their authenticity. The Court disagrees and finds that many of Defendants' exhibits may be properly considered in determining whether a question of fact precludes summary judgment in favor of CitiFinancial. For example, Defendants have presented loan documentation, dated correspondence, payment receipts, and account statements on Associates and CitiFinancial letterhead or forms. Some are bates-stamped documents produced by Defendants in discovery while others appear to have been kept as records by Frasure. The Court finds these types of documents to be proper documentary evidence under Rule 56. *See Winskunas v. Birnbaum*, 23 F.3d 1264, 1267 (7th Cir. 1994) (stating that non-movant must "present evidence of evidentiary quality – either admissible documents or attested testimony . . . demonstrating the existence of a genuine issue of material fact.").[4] Accordingly, in addition to deposition transcripts and Affidavits, the Court has also considered many of Defendants' exhibits.[5]

---

[4] Many of Defendants' exhibits contain handwriting that appears to have been added by Frasure for purposes of litigation. The Court has not considered any stray writing on the documents in ruling on summary judgment.

[5] After this Order was substantially drafted, Defendants submitted a Notice of Recent Admissions of Wrongful Actions (Doc. 113) and supporting exhibits (Doc. 114), to which CitiFinancial responded (Doc. 116). These submissions have not been considered for purposes of summary judgment.

4

IV.     **CitiFinancial's Motions to Strike**

Because they potentially impact the factual summary judgment record, the Court will first address CitiFinancial's motions to strike changes made by Frasure and Fleming to their deposition testimony.  (*See* Docs. 82 and 102.)  Federal Rule of Civil Procedure 30(e) governs changes to deposition testimony.  The Tenth Circuit has held that Rule 30(e) is not meant to allow a deponent to make substantive changes that contradict his or her original testimony:

> The purpose of Rule 30(e) is obvious. Should the reporter make a substantive error, i.e., he reported "yes" but I said "no," or a formal error, i.e., he reported the name to be "Lawrence Smith" but the proper name is "Laurence Smith," then corrections by the deponent would be in order. The Rule cannot be interpreted to allow one to alter what was said under oath. *If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination.*

*Garcia v. Pueblo Country Club*,  299 F.3d 1233, 1242 n.5 (10th Cir. 2002) (emphasis added) (quoting *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992)).  Accordingly, any changes that materially alter the original testimony are improper and must be stricken.  *See, e.g., Saffa v. Okla. Oncology, Inc.*, 405 F. Supp. 2d 1280, 1284 (N.D. Okla. 2005) (striking deposition errata sheet when changes materially altered deposition testimony).

The Court has reviewed Frasure's proposed changes compared with her original testimony, (*see* Doc. 82, Exs. 2 and 3), and has also read Fleming's proposed changes compared to his original testimony (*see* Doc. 102, Exs. 2-4.)  The Court finds that all of Frasure and Fleming's "corrections" to their deposition testimony are improper attempts to make substantive changes to testimony under oath.  Frasure and Fleming not only failed to state the reasons for their changes but, more importantly, attempted to directly contradict their original testimony.  For example, Defendants changed their testimony in many instances to provide the exact opposite response, such as changing

a "yes" to a "no" or a "correct" to an "incorrect" or a definite answer to an "I don't remember." These changes are not proper pursuant to Rule 30(e), and CitiFinancial's Motions to Strike (Docs. 82 and 102) are GRANTED.  For purposes of this Order and at trial, the Court will only consider the original deposition testimony.

## V.      Factual Background

The events in this case are extremely convoluted and confusing.  The Court has spent considerable time reviewing the parties' statements of fact and the evidentiary record.  Viewing the evidence in the light most favorable to Defendants, the following relevant events occurred.

### *June 1998 - Fleming and Frasure Meet*

In June of 1998, Fleming met Frasure when she sold him a mobile home at the dealership where she was employed.  Over the next few months, Fleming and Frasure became friends.  During this time period, Frasure's residence was 28285 West Highway 66 in Bristow, Oklahoma ("Bristow Home").  Fleming's residence was, and continues to be, P.O. Box 291, Rt. 2, Ochelata, OK ("Ochelata Home").

From August 1998 to January 1999, Fleming obtained several loans from Associates, three of which are directly at issue in this case.  Two of the loans (Loans 1 and 2) exclusively benefited Frasure.  One of the loans (Loan 3) benefited, to some extent, both Fleming and Frasure.  According to Frasure, Fleming was willing to obligate himself to loans that benefited Frasure because "he's just a very helping person."  (5/3/05 Frasure Dep., Ex. A to Mot, for Summ. J. on Loans 85:1-5.)  All three loans were co-signed by Frasure.  These three loans were signed by Defendants at an

Associates office located in Tulsa, Oklahoma, at 31st and Mingo (the "Mingo Office").[6]

### December 16, 1998 - Loan 1 - For Frasure's Car

In December 1998, Frasure was without an operable vehicle.  She attempted to obtain a loan from Associates, but Associates' employees refused her application and told her they were "going to have to deal with [Fleming]" in order to make the loan.  (5/3/05 Frasure Dep., Ex. A to Mot. for Summ. J. on Loans 93:3-12.)  On December 16, 1998, Fleming obtained a loan from Associates in the amount of $12,332.09, assigned Loan Number 0310054 ("Loan 1").  Frasure used the proceeds of Loan 1 to purchase a 1999 Chevy Silverado, which was titled in her name.  Frasure is not listed as a "borrower" in the body of Loan 1, but she co-signed as a "borrower" at the end of the document. (*See* Loan 1, Ex. 1 to Ex. E to Mot. for Summ. J. on Loans.)  Fleming and Frasure agreed that Frasure would be responsible for all payments on Loan 1.  The monthly payment for Loan 1 was $173.52.

On the same date Loan 1 was entered, Frasure signed a mortgage in favor of Associates on undeveloped property in Bristow, Oklahoma owned by Frasure ("Bristow Property"), which was filed of record on January 12, 1999.  (*See* Defs.' Ex. J,2A-2F.)  CitiFinancial alleges this mortgage was the security interest taken for Loan 1.  (*See* Joseph Barbone Aff., Ex. E. to Mot. for Summ. J. on Loans, ¶ 19.)[7]  Although not part of the documentation for Loan 1 submitted by CitiFinancial (*see* Ex. 1 to Ex. E. to Mot. for Summ. J. on Loans ), it appears that Associates took an interest in

---

[6]  The Mingo Office later became a CitiFinancial branch.  The Court refers to this as the Mingo Office whether it is owned by Associates or CitiFinancial.

[7]   Joseph Barbone ("Barbone") is a default litigation specialist with CitiFinancial. CitiFinancial cited only to Barbone's Affidavit in support of its assertion that Loan 1 was secured by the Bristow Property.

Fleming's Ochelata Home as security for Loan 1.  (*See* Defs.' Ex. J,1E ("Disclosure Statement" attached to Defendants' version of Loan 1, dated December 16, 1998, referencing Account Number 0310054 and listing Ochelata Home as security interest). CitiFinancial apparently denies that Loan 1 was also secured (or instead secured) with the Ochelata Home.  (*See* Barbone Aff., Ex. E. to Mot. for Summ. J. on Loans, ¶ 19.)  There is therefore a significant written ambiguity in the record regarding the terms of Loan 1.

In addition, construing her deposition testimony in its most favorable light, Frasure's position is that she signed the mortgage on the Bristow Property when she thought Associates was making the loan to her and that she did not believe the mortgage would have effect if the loan was actually made to Fleming.  (5/3/05 Frasure Dep., Ex. A to Mot. for Summ. J. on Loans 89:19-93:12; *see also* 10/27/06 Frasure Dep., Ex. C to Mot. for Summ. J. on Loans 79:2-14 ("I was willing to mortgage that property for that loan . . . however, they didn't take it for collateral, they also took, again, his [Fleming's] retirement home.  It's crazy I know, but that's what happened.").)  Thus, there is also an ambiguity as to the terms of Loan 1 created by Frasure's testimony.

### January 8, 1999 - Loan 2 - For Frasure's Bills and Expenses

By January 8, 1999, Frasure had found a house in Broken Arrow that she wished to purchase. Because she could not afford two mortgages, she needed to sell her Bristow Home.  She also needed cash for a down payment and other bills and expenses.

On January 8, 1999, Fleming obtained a loan from Associates in the amount of $15,094.93, assigned Loan Number 0470088 ("Loan 2").  Frasure used the proceeds of Loan 2 for paying bills and expenses.  Frasure is not listed as a "borrower" in the body of Loan 2, but she co-signed as a "borrower" at the end of the document.  (*See* Loan 2, Ex. 2 to Ex. E to Mot. for Summ. J on Loans.)

8

Loan 2 was secured by three vehicles – two owned by Frasure and one owned by Fleming.  Fleming and Frasure agreed that Frasure would be responsible for all payments on Loan 2.  The monthly payment for Loan 2 was $247.49.

***January 8, 1999 - Loan 3 - For Fleming's Purchase of Frasure's Bristow Home, Down Payment on Frasure's New Broken Arrown Home, and Pay Off of Mortgage on Bristow Home***

On the same date, January 8, 1999, Fleming obtained another loan from Associates in the amount of $132,349.15, assigned Loan Number 0310128 ("Loan 3"), for the purpose of purchasing Frasure's Bristow Home.  Frasure is not listed as a "borrower" in the body of Loan 3, but she co-signed as a "borrower" at the end of the document.  (*See* Loan 3, Ex. 3 to Ex. E to Mot. for Summ. J. on Loans.)  The monthly payment for Loan 3 was $1223.65.

The same day, January 8, 1999, Frasure executed a mortgage in favor of Associates on the Bristow Home, which was recorded on January 19, 1999. (*See* 10/27/06 Frasure Dep., Ex. C to Mot. for Summ. J. on Loans, at Dep. Ex. 14; *see also* Defs.' Exs. E,9-E,16.)[8]  CitiFinancial alleges that Loan 3 "was secured by a mortgage on the Bristow Home."  (Mot. for Summ. J. on Loans ¶ 20.)  According to Frasure, when she signed this mortgage, Associates' employees told her "it was to allow them to pay off the house [Bristow Home] - the - note on the house," and that she "never saw this [the mortgage] with this money figures [$132,000] on there." (10/27/06 Frasure Dep., Ex. C to Mot. for Summ. J. on Loans, at 70:19-74:24.)  Nonetheless, Frasure admits to signing the mortgage in favor of Associates on this date.

Although not included by CitiFinancial in its statement of facts, the copy of Loan 3 submitted by CitiFinancial shows that Loan 3 was also secured by the Ochelata Home.  (*See id.*)

---

[8]  The Bristow Home involved in Loan 3 is a residence and is distinct from the Bristow Property involved in Loan 1.

9

The complete record indicates that Associates gave Fleming a loan for purchase of Frasure's Bristow Home, while simultaneously taking a mortgage in its favor from Frasure on the Bristow Home and a security interest in Fleming's Ochelata Home. CitiFinancial does not mention, in its statement of facts, that it took a security interest in the Ochelata Home. Thus, there is some ambiguity, created by CitiFinancial's own evidence, as to the security interest taken for Loan 3.

A portion of the proceeds of Loan 3 – $21,000 – was used by Frasure as a down payment on the new home in Broken Arrow, Oklahoma ("Broken Arrow Home"). Another portion of Loan 3 – $81,640 – was used to pay off Frasure's original mortgage on the Bristow Home, so that Associates would have first priority in the event of default. According to the loan documents, the remainder of Loan 3 was used for "other insurance" and "AFSCI 0468122." (*See* Loan 3, Ex. 3 to Ex. E to Mot. for Summ. J. on Loans.)

At the time of taking out Loan 3, Fleming and Frasure's plan was to rent out the Bristow Home and use the rental proceeds to make the payments on Loan 3. Although Fleming was going to be the technical owner of the Bristow Home, Frasure was to find the tenants, collect the monthly rent, and use the rent to make the loan payments. Fleming did not live at the Bristow Home he purchased but instead continued to live at the Ochelata Home.

### January 13, 1999 - Frasure's Purchase of Broken Arrow Home

On January 13, 1999, Frasure purchased the Broken Arrow Home, where she resided at the time of relevant events giving rise to her counterclaims and where she currently resides. Frasure made the down payment on the Broken Arrow Home with cash generated by Loan 3 but borrowed the remainder from a separate mortgage company. The mortgage on the Broken Arrow Home is not at issue, and it is undisputed that neither Associates nor CitiFinancial ever had a security interest in

10

the Broken Arrow Home.

***January 15, 1999 - Deed of Bristow Home to Fleming***

Two days later, on January 15, 1999, Frasure deeded the Bristow Home to Fleming.  Thus, as of January 15, 1999, Fleming owned the Bristow Home, encumbered by the mortgage held by Associates.

***August 1999 - Associates' Actions Related to Broken Arrow Home***

By August 1999, Frasure was admittedly " a little behind" on her payments on at least one of the loans.  On August 30, 1999, Associates' employees Eric Turley ("Turley") and Kevin Casper ("Casper") went to the Broken Arrow Home.  According to Frasure, they told her they were there to "do a foreclosure on this house."   (5/24/05 Frasure Dep., Ex. C to Mot. for Summ. J. on Counterclaims at 43:23-25.)  Frasure informed them that Associates did not have a security interest in the Broken Arrow Home for Loans 1, 2, or 3 but instead had an interest in her Bristow Home.[9]

***November 11, 1999 - Modified Payment Agreement***

In November 1999, after informing Associates of the wrongful foreclosure actions on the Broken Arrow Home, Defendants made an agreement with an Associates' employee, Matt Evans, of the Mingo Office.  This agreement reduced the monthly payments on Loans 1, 2, and 3.  Specifically, they agreed on new monthly payments as follows: $87.00 for Loan 1, due on the first of every month; $124.00 for Loan 2, due on the eighth of every month; and $740.00 for Loan 3, due on the twentieth of every month.  This agreement was memorialized by letter dated November 11, 1999 and signed by David Lee, Regional Vice President of Associates (the "Modified Payment

---

[9] Citifinancial concedes that this and all subsequent foreclosure actions related to the Broken Arrow Home were in error.

Agreement"). (*See* Defs.' Ex. D,32.) The letter also stated: "In order . . . to process any payment or rate modifications, payments must be received each month by the due date." (*Id.*)

***Examples of Defendants' Alleged Attempted Payments in 2000-2001***

Frasure alleges that she attempted to make payments on the loans in 2000 and 2001 in amounts consistent with the Modified Payment Agreement. Such allegations are supported by record evidence. For example, Defendants' Exhibit D,33, a "Receipt for Payment," indicates that Associates received $2220.00 (3 installments of the $740.00 payment for Loan 3) for the months February-April 2000. Defendants' Exhibit D,34, a "Receipt for Payment," indicates that Associates received $1480.00 (2 installments of the $740.00 payment for Loan 3) for May and June of 2000. Defendants' Exhibits D,40, a "Receipt for Payment," indicates that Frasure made a $951.00 payment on August 3, 2000. This amount constituted a $87.00 payment on Loan 1, $124.00 payment on Loan 2, and $740.00 payment on Loan 3. Defendants' Exhibit J,7A, copies of two detachable stubs from Travelers Express Company, Inc., indicate that, on January 26, 2001, Frasure made two payments on Loan 1 (totaling $174.00) and two payments on Loan 2 (totaling $248.00) for December 2000 and January of 2001. Defendants' Exhibit D,42, copies of American Express Money Orders dated March 21, 2001 and April 15, 2001, indicate that Frasure attempted to pay CitiFinancial four payments on Loan 1 in the total amount of $348.00.[10] As explained below, many of these payments were not accepted, allegedly because they were for insufficient amounts or because they referenced an incorrect account number.

---

[10] CitiFinancial has not directly disputed that such payments were made but has merely urged the Court to disregard all Defendants' exhibits.

*June 5, 2000 - Associates Reassigns Fleming's "Account" to Texas Office*

On June 5, 2000, Associates sent a letter to Fleming at Frasure's Broken Arrow address[11] informing him that his "Associates account" (with no reference to an account number) had been assigned to an office in Irving, Texas, and had been assigned account number 0315158 ("Reassignment Letter"). (*See* Defs.' Ex. E,1.) The Reassignment Letter is unclear as to which of Fleming's "accounts" (Loan 1, 2, or 3) had been transferred to Texas. Further, it did not inform Fleming where to make his payments.

*June 19, 2000 - Attorney Letters to Fleming Regarding Foreclosure on Broken Arrow Home*

On June 19, 2000, the Kansas law firm of Likens & Blomquist ("Likens") sent a letter to Fleming, at Frasure's Broken Arrow address, informing Fleming (1) that Likens represented Associates, (2) that Fleming owed $130,680.05 on a Promissory Note dated February 20, 2000, and (3) that Likens had been "directed to foreclose against the property referenced above [the Broken Arrow Home]." (Defs.' Ex. E,2.) This letter appears to be in error by referencing a loan dated February 20, 2000, which is not part of this record. The letter is clearly in error by referencing a security interest in the Broken Arrow Home. Also on June 19, 2000, Likens sent an identical letter to Fleming, at Frasure's Broken Arrow address, except this time referencing a Promissory Note entered January 13, 1999, which is the correct date of Loan 3.

*July 20, 2000 - Return of $1480.00 Payment*

On July 20, 2000, Associates disbursed a check in the amount of $1480.00 payable to "Karen Frazier" accompanied by a letter stating "it is our company policy not to accept anything less than

---

[11]  All correspondence from Associates was sent to Fleming at Frasure's Broken Arrow address. Authorized by Fleming, Frasure opened all such mail.

the entire amount of what is due on your account in order to dismiss our ongoing foreclosure action against your property" and stating that it "would require a payment of $7,085.55" to bring "your account current." (Defs.' Ex. D,35.)   This letter references Account Number 023517780315121, which was not the loan number originally assigned to Loans 1, 2, or 3 or the new account number referenced in the Reassignment Letter.  The Court does not know what account this letter is referring to, but, based on the amount owing, it does not appear to be Loan 3.  This is confusing because the $1480.00 payment being returned was for Loan 3.  Further, the only "ongoing foreclosure" was on the Broken Arrow Home, for which no interest was actually taken.

At some point in June or July 2000, Frasure contacted attorney Skip Holtmann, who attempted to help her resolve the situation regarding the Broken Arrow Home and various loan accounts.  Frasure did not cash the $1480.00 returned check and instead sent it back to the Texas office.  (*See* Defs.' Exs. D,38-39.)

***November 15, 2000 - Frasure Sends Letter to Associates***

On November 15, 2000, Frasure alleges to have sent a letter "to whom it may concern" at Associates, which provides:

> I, Karen Frasure, received another phone call from the Associates in Texas saying they were foreclosing on my home in Broken Arrow.  I have tried to get the situation understood concerning why they are doing this and they can't seem to get straight on what is going on with the real estate loan with Albert Fleming.  I was going to make the payment and the place had been closed in SandSprings [sic], OK.  I called the other office on Sheridan and their manager said he couldn't take any payments on the account and I explained to him why I could not deal with the Mingo office and he said to send my payments to the place on the statement.  I called back the lady in Texas and she said the same thing.  *She also said that none of my payments had been posted for this year and I decided there was no since [sic] in me paying any more on the Realestate [sic] loan until I can be showed where my payments are being received.*  So if someone would Please help me with this it would be most appreciated.
> These are the accounts I have been paying on:

| | | |
|---|---|---|
| #0310054 | Reg. pmt amt 173.52 | Modified 87.00 |
| #0310128 | Reg. pmt amt 1223.65 | Modified 740.00 |
| #0470088 | Reg. pmt amt 247.49 | Modified 124.00 |

any other account numbers than these, I don't understand why they would be apart of the Albert Fleming accounts.  Please Respond!

(Defs.' Ex. E,25 (emphasis added); *see also* 5/24/05 Frasure Dep. 133:15-134:5.)

### *CitiFinancial's Acquisition of Loans 1 and 3 (January 2001) and Loan 2 (September 2004)*

CitiFinancial does not offer contextual facts or supporting documents, other than the Barbone Affidavit, regarding its acquisition of Loans 1, 2, and 3.  In its Motion for Summary Judgment on Loans, CitiFinancial merely asserts that it "acquired the three loans the Associates made to Fleming and Frasure," citing to the Barbone Affidavit.   In its Motion for Summary Judgment on Counterclaims, CitiFinancial states that, effective January 1, 2001, it "acquired Loans 1 and 3 through a bulk transfer from Associates' successor in interest to those loans."[12]   Further, CitiFinancial states that, effective September 2004, it "acquired Loan 2 through an individual assignment from Associates' successor-in-interest to that loan."  Again, CitiFinancial cites only to the Barbone Affidavit.  It is unclear why Loan 2 was acquired well after Loans 1 and 3.  It also unclear from what entity CitiFinancial actually acquired the loans, except that it was Associates' "successor in interest."

### *January 23, 2001 - Form Letter from Associates*

On January 23, 2001, Fleming received a letter, at Frasure's Broken Arrow address, from

---

[12]   This timing is consistent with Citigroup, Inc.'s purchase of Associates.  According to a Federal Trade Commission press release, Citigroup, Inc. purchased Associates for $31 billion and "merge[d] the Associates' operations into its own" in November of 2000.  *See FTC Charges One of Nation's Largest Subprime Lenders with Abusive Lending Practices*, Press Release 3/6/01, available at www.ftc.gov/opa/2001/03/associates.shtm. There is no information in the summary judgment record regarding the relationship between CitiFinancial Mortgage Company, Inc., the Plaintiff in this case, and other related Citigroup or CitiFinancial entities.

an Associates "Loss Mitigation Specialist" in New Jersey, informing him that Account Number 023517780315121 was overdue and suggesting ways to avoid a possible foreclosure on his property. (Defs.' Ex. F,12.)   This is the first of several subsequent "form"-type letters referencing this unidentified account number and threatening foreclosure on the Broken Arrow Home.

*January 26, 2001 - "Welcome" Letter from CitiFinancial*

On January 26, 2001, Fleming received a letter, at Frasure's Broken Arrow address, informing him that Associates had become part of "CitiFinancial" and that "your Associates branch will have a new name above the door." (*See* Defs.' Ex. F,1.)   This letter is on "CitiFinancial" letterhead and is signed by Turley, who had now become manager of the CitiFinancial branch housed in the Mingo Office. (*Id.*)[13]   This letter would reasonably be understood by Defendants to mean that Associates ceased to exist, and "CitiFinancial" took its place as the lender for Loans 1, 2, and 3.  However, as explained below, there are events and correspondence involving "Associates" even after the merger.  It is unclear if these are just mistakes in failing to use new letterhead or if Associates continued to exist in some capacity.

This letter from CitiFinancial referenced yet another new account number, 203596C, but did not state an amount owing. (*Id.*)  Thus, this letter is unclear as to which of Loan 1, 2, or 3 was being assigned new account number 203596C.[14]   The letter stated that all payments on account number 203596C should be mailed to the Mingo Office. (*Id.*)

---

[13]  This letter, on CitiFinancial letterhead, seems to contradict CitiFinancial's contention that it never employed Turley. (*See* Mot. for Summ. J. on Counterclaims ¶ 21.)

[14]  CitiFinancial alleges it did not acquire Loan 2 until 2004.  However, the record does not indicate that Defendants were made aware of this fact or that Defendants had any reasonable means to discern what account (Loan 1, 2, or 3) this letter was referring to.

***March 2001 - Frasure Petitions for Protective Order After Second Visit to Broken Arrow Home***

On March 5, 2001, Frasure filed a Petition for Protective Order in Wagoner County, seeking a protective order preventing "Associates a/k/a CitiFinancial, Shane Bennett, or Steve Johnson" from harassing her.  According to the Petition, Associates a/k/a CitiFinancial had "sent a man to my house today 3/5/01 again to cause me more problems."  (Defs.' Ex. F,15.)  These actions in March of 2001 relate to repossession of one of Frasure's vehicles, which secured Loan 2.  CitiFinancial alleges it did not acquire Loan 2 until September 2004.  Yet these men who visited Frasure's home appear to be employees who worked at the CitiFinancial Mingo Office.[15]  The Wagoner County court denied the Petition for Protective Order, but ordered Frasure to write a letter to her lender requesting that she only be contacted by certified mail.

***April 5, 2001 - Letter from Burnside Regarding Foreclosure***

On April 5, 2001, Cristina Burnside ("Burnside"), a Loss Mitigation Specialist in Arizona, sent a letter to Fleming, at Frasure's Broken Arrow address, on Associates letterhead stating that "your account has reached a very serious stage of delinquency and we are using a local attorney to facilitate the foreclosure process against your home."  (*See* Defs.' Ex. G,1.)  The letter also stated that they had several programs to help him out of his current financial condition and requested that he contact her by April 16, 2001 to "explore his options."  (*Id.*)  The letter referenced Account Number 023517780315121.  Again, this was a foreclosure threat on an incorrect property in reference to an unidentifiable account number, and from a company that Defendants had been

---

[15] It is unclear to the Court on whose behalf these repossession efforts were taken for Loan 2, if it is true that Associates had been merged with some CitiFinancial entity but that CitiFinancial, the Plaintiff in this case, had not yet acquired Loan 2.  The Court has resolved any ambiguities in this regard against CitiFinancial.

informed was no longer servicing their loans.

**April 20, 2001 - Letter from Turley at Tulsa Office Returning March/April 2001 Payments on Loan 1**

On April 20, 2001, Turley, Branch Manager of the CitiFinancial Mingo Office, sent Frasure

a letter stating:

> We received your request to halt all contact to you except for account statements and letters via certified mail. This is to inform you that since your account numbers have change [sic] to avoid any confusion you will need to refer to the proper CitiFinancial account number for proper posting. As well the two other accounts have been transferred to out of state, in-house collection departments and all payment must be forwarded to them. We will comply with the Fair Debt Collection Act and will not contact you except in the aforementioned manners. *The only account in this office is account number 203596 (formerly 0313934) and the payment required by agreement with the former District Manager David Lee is $87.00.* I will not post payments to the account with proper reference to the account number because your money order refers to the former account number of 0310054, which was transferred in 2000 to Dallas, Texas for collection.

(Defs.' Ex. D,43 (emphasis added).) This letter states that the account being serviced by the Mingo

Office (requiring payments in the modified amount of $87.00) was formerly Account Number

0313934. However, this is not the account number assigned to Loans 1, 2, or 3. It is also not the

account number listed in the Modified Payment Agreement sent to Frasure by District Manager

David Lee on November 11, 1999, which is expressly referenced by Turley. Instead, according to

the Modified Payment Agreement, the $87.00 payment was for account number 0310054 (Loan 1).

(*See* Defs.' Ex. D,32.) Thus, it appears Frasure referenced the correct former account number for

Loan 1 on her payment and it was Turley who was in error.

**May 26, 2001 - Letter from Burnside Regarding Foreclosure**

On May 26, 2001, Burnside sent another letter, this time addressed to both Frasure and

Fleming and sent to the Broken Arrow address, referencing Account Number 023517780315121.

18

(Defs.' Ex. G,5.)  The letter stated that $19,322.05 was past due on this account and demanded

payment.  (*Id.*)  The letter also stated that "[t]he above property [Broken Arrow Home] is very close

to going to sale.  This is your last opportunity to save it."  (*Id.*)  Neither the amount owing or the

account number are identifiable based on the record before the Court.

### June 9, 2001 Letter from Tulsa Lawyer Hired by CitiFinancial to Return March/April 2001 Payments on Loan 1

On June 9, 2001, lawyer Steven E. Chlouber, of Duller, Chlouber & Frizzell, a Tulsa law

firm, sent Frasure a letter regarding "CitiFinancial Account # 203596."  It states:

> CitiFinancial's Tulsa Mingo Office has asked me to contact you regarding payments
> that you made in March and April to the Tulsa office.  Citifinancial attempted to send
> the payments back to you via certified mail.  However, you did not accept service of
> either certified mail.  Consequently, I am enclosing two American Express Money
> Orders for $87.00 dated April 15, 2001 and $261.00 dated March 21, 2001 . . . .  The
> payments you made are for accounts that the Tulsa Mingo office does not service.
> You should contact the local office to determine where you should mail payments
> to Citifinancial on your other accounts with Citifinancial.  The one account that the
> Mingo Tulsa office does service is account 203596 formerly account 0313934 and
> the amount of the monthly payment is $173.52. . . .

This letter is inconsistent with the April 2001 letter from Turley, which stated that Frasure owed

$87.00 per month on the account being serviced by the Mingo Office.  The $173.52 amount was the

original, rather than the modified, payment required for Loan 1.  Both letters reference an

unidentified "former" account number for Loan 1 that does not match up with the Modified Payment

Agreement.  Thus, as late as March 2001, Frasure was attempting to make payments on Loan 1 in

the amount set forth in the Modified Payment Agreement, was referencing a correct (albeit former)

account number, and yet was receiving correspondence indicating that the payment was

unacceptable.

### July-October 2001 - Letters from "Loss Mitigation Specialists"

From July to October of 2001, Fleming received monthly letters from Burnside and other "Loss Mitigation Specialists," referencing Account Number 02351778031512. These letters stated that Fleming's "account" was delinquent and invited him to call and explore options to "avoid a possible foreclosure on [the] property." (*See* Defs.' Ex. G, 12-14, 29.)

**Late 2001 - Phone Conversations with Burnside**

Frasure alleges to have had several phone conversations with Burnside during November 2001. Some such conversations occurred after Burnside called Fleming and allegedly told him CitiFinancial would be foreclosing on the Broken Arrow Home in five days, which prompted Frasure to call Burnside. A few of these phone conversations with Burnside were recorded by Frasure. These conversations were officially transcribed by Goodman & Clark Reporting and are Defendants' Exhibits L-1A-L1KK.[16] During these conversations, Burnside admitted she was confused regarding whether CitiFinancial actually owned an interest in the Broken Arrow Home, (*see* Defs.' Ex. L,1F at 8:7-21), but stated that "as to this loan, I do believe it is the house on 228th Street [Broken Arrow Home]," (*id.* L,1O at 16-25).[17]

**November 2001 - Title Work Done on Broken Arrow Home**

CitiFinancial hired Buffalo Land Abstract Company to complete a Title Report on the Broken Arrow Home. (*See* Defs.' Ex. G,20.) This Title Report, completed on November 7, 2001,

---

[16] CitiFinancial urges that these transcripts should not be considered because Frasure has inserted writing and comments on them. Again, the Court has ignored stray writing and relied only on the officially transcribed portions.

[17] "CitiFinancial Mortgage" was the name stated by the automated voice as the recipient of the call, prior to transfer to Burnside. (*See* Defs.' Ex. L-1,D at 6:22.) This seems to contradict CitiFinancial's contention that it never employed Burnside. (*See* Mot. for Summ. J. on Counterclaims ¶ 29.)

revealed that CitiFinancial had no mortgage or other interest in the Broken Arrow Home. (*See* Defs.' Ex. G,21.) On November 19, 2001, an individual in the Mingo Office prepared a foreclosure checklist document listing a "concern[] about foreclosing on this account" that they "have no original file - no mortgage file per titlework." (*See* Defs.' Ex. G,27.) The checklist references Account #203596, which was the "new" account number assigned to Loan 1. On November 20, 2001, Wagoner County Abstract Company faxed a "Record Search Report" on the Broken Arrow Home to Kivell, Rayment, Francis, Coulson and Heath ("Kivell Firm"), a Tulsa law firm hired by CitiFinancial. This report also revealed that CitiFinancial had no interest in the Broken Arrow Home. It is unclear to the Court for which loan, Loan 1 or Loan 3, CitiFinancial believed it had an interest in the Broken Arrow Home. In either event, CitiFinancial appears to have believed it had such an interest as late as November 2001.

### November 9, 2001 - Letter From Tulsa Law Firm Regarding Broken Arrow Home

On November 9, 2001, the Kivell Firm sent a letter to Fleming at Frasure's Broken Arrow address. This letter referenced Mortgage Loan No. 023517780315121 and a Property Address of 7101 S. 228th East Ave., Broken Arrow, OK 74104 (the Broken Arrow Home). (Defs.' Ex. G,32.) The letter stated that the firm had been hired by CitiFinancial, the owner of the obligation represented by the promissory note and mortgage "executed on January 13, 1999 (date of mortgage)." (*Id.*) The letter stated that the entire principal balance had been accelerated and was due and owing in the total amount of $155,338.69. The letter invited Fleming to call the office if he wished to receive figures to reinstate (bring his loan current) or pay off his loan through a specific date. (*Id.*) Again, this account number is unidentifiable based on the record before the Court.

### December 2001 - Frasure Hires Another Attorney

21

After receiving the November 9, 2001 letter from the Kivell Firm, Frasure again sought legal help and hired the Tulsa firm of Latham, Stall, Wagner, Steele & Lehman ("Latham Firm").   On December 5, 2001, the Latham Firm sent a letter to the Kivell Firm advising that they had been retained by Frasure.   The letter responded to the November 9, 2001 letter and stated:

> You should know that Ms. Frasure is the record owner of the property, not Albert Fleming.  I attach the Warranty Deed vesting title in Ms. Frasure for your review. Accordingly, Ms. Frasure disputes that there is any debt owing to CitiFinancial Mortgage Company, Inc. on this property.  Therefore, she demands that you provide the instruments (Note and Mortgage) that your client claims grants it mortgage interest in the above property.

(Defs.'s Ex. H,1-6.)

### January 28, 2002 - Letter from Kivell Firm to Fleming

On January 28, 2002, after the Kivell Firm had been contacted by Frasure's attorney, they sent another letter addressed to Fleming at the Broken Arrow Home, referencing Loan Number 023517780315121, stating: "Pursuant to your request, please be advised the current pay-off amount on the above loan is $169,503.74.  This figure is valid until 1/31/02 and must be remitted to our office in the form of a cashier's check payable to CitiFinancial Bank."  (Defs.' Ex. H,11.)  At the bottom of this letter, there is a note that reads:  "Note: Since the foreclosure action is continuing, there may be additional costs."   (*Id.*)   Thus, foreclosure was at least mentioned even after CitiFinancial had been informed by an attorney that CitiFinancial owned no interest in the Broken Arrow Home.

### February 2002 - Frasure Files State Court Lawsuit

On February 25, 2002, Frasure sued CitiFinancial and its related entities; Turley; Casper; and Burnside in state court in Wagoner County, Oklahoma ("Wagoner County Suit"), alleging causes of action for intentional infliction of emotional distress ("IIED") and defamation related to the

mistaken threats to foreclose on her Broken Arrow Home.  Frasure was represented by the Latham Firm.  After conducting discovery, much of which is part of the record in this case, CitiFinancial filed a Motion to Compel Arbitration based on arbitration agreements allegedly signed by Frasure at the time of Loans 1, 2, and 3.  The district court denied the motion to compel arbitration.  This decision was affirmed by the Oklahoma Court of Civil Appeals ("OCCA") and sent back to the district court on August 26, 2003.

***March 2006 - Dismissal of State Court Lawsuit and Filing of Federal Lawsuit***

On March 7, 2006, the Wagoner County court dismissed the case pursuant to Rule 5(J) of the Rules for District Courts of Oklahoma.[18]  On the same day, CitiFinancial's counterclaims for amounts owed on the loan were also dismissed.  One week later, on March 15, 2006, CitiFinancial filed the instant lawsuit to recover amounts owed on the loans.  Defendants filed counterclaims similar to the claims asserted in the Wagoner County Suit regarding the alleged wrongful foreclosure actions on the Broken Arrow Home.

## VI.    Motion for Summary Judgment on Loans

CitiFinancial moves for summary judgment on its claim that Defendants are in breach of the loan agreements.  CitiFinancial seeks judgment in its favor against Frasure and Fleming, jointly and severally, for the total amount of $274,592.57.[19]  To prevail on each of its claims for breach of the

---

[18] Rule 5(J) governs "default" and provides that failures to appear or prepare various court pleadings can result in striking a pleading, a preclusion order, staying the proceeding, default judgment, assessment of fees and expenses, or such other order as the Court may deem just and proper. Okla. Stat. tit. 12, Ch. 2, Appx.  There is no evidence in the record regarding the reason for dismissal.

[19] Specifically, CitiFinancial seeks judgment in the following amounts: (1) Loan 1: $15,597.99 (consisting of $9,245.32 in unpaid principal plus $6,352.16 for contract interest accruing from 11/28/06 to 11/14/06 at the rate of 11.52% per year); (2) Loan 2: $26,168.80 (consisting of

loan agreements, CitiFinancial must prove: (1) the existence of a valid contract; (2) breach of that contract; and (3) damages. *See Young v. Thomas*, 930 P.2d 836, 839 (Okla. Ct. App. 1996).

A.     Existence of Valid Contract

In its Motion for Summary Judgment on Loans, CitiFinancial preemptively addresses two arguments related to the first element:  Frasure's alleged failure to sign Loans 1 and 3; and CitiFinancial's loss of the original loan agreements.  Defendants have raised affirmative defenses to the existence of valid loan agreements, which relate to misrepresentation and violation of public policy.

1.     Frasure's Alleged Failure to Sign Loans 1 and 3

Frasure only admits to co-signing Loan 2.  She admits signing the mortgages connected with Loans 1 and 3 but denies co-signing the actual loans.  (*See* Mot. for Summ. J. on Loans ¶ 33 and transcript references therein.)  The Court finds Frasure's allegations of forged signatures on Loans 1 and 3 to be insufficient to create a question of fact for two reasons.  First, Frasure has submitted nothing but conclusory, unsupported allegations that her signature appearing on Loans 1 and 3 was forged.  Such allegations, unsubstantiated by other evidence, are insufficient to create a genuine issue of fact.  *See Elsken v. Network Multi-Family Sec. Corp.*, 49 F.3d 1470, 1476 (10th Cir.1995) ("Conclusory allegations that are unsubstantiated do not create an issue of fact and are insufficient to oppose summary judgment.").

Second, the doctrine of judicial estoppel prevents Frasure from alleging she did not sign the

---

$12,631.36 in unpaid principal plus $13,537.44 in contract interest accruing from 11/18/00 to 11/14/06 at the rate of 18% per year); and (3) Loan 3: $232,825.78 (consisting of $130,680.05 in unpaid principal plus $97,190.15 in contract interest from 9/28/09 to 11/14/06 at the rate of 10.63%/year plus $4,955.58 in late fees for the past eighty months).  CitiFinancial also seeks its costs and fees in an amount to be determined after trial.

loans.  The doctrine of judicial estoppel provides that, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."  *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1069 (10th Cir. 2005).  Although judicial estoppel is not reducible to "any general formulation of principle," courts typically consider a three-part test in determining whether it applies:  (1) whether the two positions are clearly inconsistent;  (2) whether the party has succeeded in persuading a court to accept the earlier position, so that judicial acceptance of an inconsistent position would create the perception that one of the two courts had been misled; and (3) the party seeking to assert an inconsistent position would impose an unfair detriment on the opposing party if not estopped.  *See id.*

In affirming the district court's denial of CitiFinancial's motion to compel arbitration in the Wagoner County Suit, the OCCA stated:

> Although Frasure denies that she was a "party" to any arbitration agreement with CitiFinancial, *she admits that she co-signed the three loans* and signed arbitration agreements applying to Loans #1 and #2.  The function of the trial court and our function here, therefore, is limited to ascertaining whether Frasure is making a claim governed by the arbitration agreements she signed.

(12/26/03 Order, Ex. G to Mot. for Summ. J. on Loans at 4 (emphasis added).)  The OCCA also stated that "Frasure argues that she is not a party to any of the arbitration agreements because she is not named as a borrower, *even though she admits she signed the agreements and served as a co-signer on the loans.*"  (*Id.* at 4 n.4 (emphasis added).)  The OCCA's opinion makes clear that Frasure, represented by counsel, made the factual admission that she signed Loans 1, 2, and 3.  The Court finds that judicial estoppel applies because: (1) her allegations of forgery in this case are

25

clearly inconsistent with her factual admissions before the OCCA; (2) if the Court were to accept Frasure's current allegations, it would result in inconsistency and the perception that either this Court or the OCCA had been misled; and (3) if the Court were to accept Frasure's current allegations of forgery, it would result in a detriment to CitiFinancial.  Frasure is therefore judicially estopped from arguing that she did not co-sign the loan agreements.[20]

The Court further concludes that Frasure's signature as a co-signer on the loans is sufficient to obligate her to the amounts owed and that Frasure's failure to be named as a borrower in the body of the loan agreements does not relieve her of liability.  *See Livingston v. Brown*, 227 P.2d 124 (1924) ("In the preparation of a written contract it is the common form and practice to write the name of all parties in the body of the instrument.  If, however, the name of one of the parties be omitted from the body of the instrument and he signs the instrument, he will be bound by its terms."); *see also* 12/26/03 OCCA Order at 4 n.1, Ex. G. to Mot. for Summ. J. on Loans (stating that "[a]lthough it is not essential to our holding here, we note that Frasure does indeed appear to be a party to each of the three loans") (citing *Livingston*).  This conclusion is particularly appropriate in this case because Frasure was a significant beneficiary of all three loans.

### 2.    Lack of Originals

It is undisputed that CitiFinancial has not produced the original loan agreements for Loans 1, 2, and 3.  Thus, in order to meet the first element of its claim for breach of such agreements,

---

[20]  In light of these conclusions, the Court will not consider any evidence at trial regarding Frasure's alleged failure to sign the loans, and CitiFinancial's Motion in Limine on this topic (Doc. 43) is GRANTED.

CitiFinancial must show that the copies of the loans seeking to be enforced, which are contained at Exhibits 1-3 to the Barbone Affidavit, are enforceable as originals.  CitiFinancial argues the copies are enforceable pursuant to a provision in the Oklahoma Uniform Commercial Code ("OUCC") governing lost, destroyed, or stolen negotiable instruments.  Such are enforceable if the possessor can meet these initial conditions:

> (I) the person was in possession of the instrument and entitled to enforce it when loss of possession occurred, (ii) the loss of possession was not the result of a transfer by the person or a lawful seizure, and (iii) the person cannot reasonably obtain possession of the instrument because . . . its whereabouts cannot be determined . . . .

Okla. Stat.  tit. 12A, § 3-309(a).  After meeting these initial conditions, the holder must then prove "*the terms of the instrument,* and the person's right to enforce the instrument."  *Id.* § 3-309(b) (emphasis added).  The Court must also find that Defendants, the obligors, are "adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument."  *Id.*

CitiFinancial has presented undisputed facts, through the Barbone Affidavit, that the first three conditions are satisfied.  First, either CitiFinancial or its assignor, Associates, was in possession of the original instruments and entitled to enforce them when they were lost. (*See* Barbone Aff. ¶15.) Second, CitiFinancial has not transferred the loan agreements, nor were the loan agreements lawfully seized.  (*Id.* ¶ 16.)  Finally, CitiFinancial cannot reasonably obtain possession of the original instruments because, after diligent search and investigation, it cannot determine their whereabouts.  (*Id.* ¶ 14.)

As to their right to enforce the instruments, CitiFinancial has presented the undisputed Barbone Affidavit stating that CitiFinancial acquired Loans 1-3; that Associates warranted that it had the right and authority to enforce the loan agreements against Defendants; and that CitiFinancial

now has the right to enforce the loan agreements.  (Barbone Aff. ¶¶ 8, 10, 11.)   Although CitiFinancial has not provided the Court with actual assignment documents, which would have been more direct proof of these requirements, the Court finds an undisputed Affidavit to be sufficient. *Cf. In re Gavin*, 319 B.R. 27, 33 (B.A.P. 1st Cir. 2004) (refusing to enforce lost instrument because alleged holder did not submit an "affidavit, or any form of direct evidence tending to prove that Fleet assigned the Note to Sovereign").

With respect to the issue of "adequate protection," the Court finds Frasure and Fleming are adequately protected against any loss "that might occur by reason of a claim by another person to enforce the instrument." *See* Okla. Stat. tit. 12A, § 3-309(b).  In this case, the loan agreements are not payable to the bearer.   Rather, they are payable only to Associates, CitiFinancial's predecessor-in-interest.  No person other than CitiFinancial can be a holder of the instrument, and thus, no person other than CitiFinancial can enforce the agreements.  Although Defendants dispute various aspects of their obligation to CitiFinancial, they have never asserted that there is another creditor making competing claims under the same agreements or for the same amounts.

However, although the other elements are met, CitiFinancial is not entitled to summary judgment on the enforceability of Loans 1 and 3 because it has not proven the terms of these instruments as a matter of law.  As proof of the terms of the loans, CitiFinancial has presented Exhibits 1-3 to the Barbone Affidavit, which purport to be copies of the originals that were scanned into a computer system and electronically reproduced for this litigation.  Ordinarily, submission of a copy of the lost instrument is sufficient to prove its terms. *See In re Caddo Parish-Villas South, Ltd.*, 250 F.3d 300, 302 (5th Cir. 2001) (applying identical provision of Louisiana law and concluding that assignee had proven the terms of the terms of the instrument by "submitting a copy

28

of the note and mortgage at the bankruptcy proceeding"). However, in this case, for the reasons explained *supra* pages 7-8, the Court finds ambiguity in the record regarding whether Loan 1 as submitted by CitiFinancial is actually a copy of the original agreement. (*Compare* Ex. 1 to Ex. E to Mot. for Summ. J. on Loans (purporting to be copy of original Loan 1) *with* Defs.' Exs. J,1A-H (different version of Loan 1 containing "Disclosure Statement" referencing Account Number for Loan 1 and taking security interest in Ochelata Home). In addition, Frasure alleges that, after Associates determined it would lend the money to Fleming instead of her, the mortgage she executed on the Bristow Property ceased to be part of their agreement for Loan 1, and Associates took a security interest in Fleming's Ochelata Home instead. In contrast, CitiFinancial appears to allege that it took only a security interest in the Bristow Property. (*See* Mot. for Summ. J. on Loans, ¶ 18.) Thus, CitiFinancial has not proven the terms of Loan 1 as a matter of law.

With respect to Loan 3, CitiFinancial appears to allege that it took only a security interest in the Bristow Home for Loan 3, (*see* Mot. for Summ. J. on Loans, ¶¶ 20, 22), despite the fact that its own submitted copy of Loan 3 also takes a security interest in the Ochelata Home (*see* Mot. for Summ. J. on Loans, Ex. 3 to Ex. E.). In the Court's view, CitiFinancial's own evidence creates an ambiguity as to the terms of Loan 3; specifically, there is a question of what the parties agreed as the security interest to be taken for Loan 3. Thus, CitiFinancial has also not proven the terms of Loan 3 as a matter of law.

With respect to Loan 2, there is nothing in the record to cast doubt on its accuracy or on the terms of the agreement agreed to by the parties. The Court finds Loan 2 is enforceable as submitted by CitiFinancial as a matter of law.

In sum, the Court finds CitiFinancial has not proven the terms of Loans 1 and 3, such that

the submitted copies are enforceable pursuant to the OUCC as a matter of law.[21]  It will be a question of fact at trial as to whether CitiFinancial can sufficiently prove that the copies of Loans 1 and 3 they seek to enforce accurately reflect the terms of the agreements.  The Court finds CitiFinancial has proven the terms of Loan 2 as a matter of law, and the Court will require no additional proof at trial regarding the enforceability of the copy of Loan 2.

### 3.    Violation of Public Policy

Construing their defenses liberally, Defendants contend CitiFinancial cannot show the existence of a valid contract because (1) CitiFinancial has not complied with the Federal Fair Debt Collection Practices Act and similar state laws (*see* Am. Answer and Counterclaim 7); and (2) the loans generally violate Oklahoma public policy (*see* Amended Resp. to Mot. for Summ. J. on Loans 2).  As to these affirmative defenses, Defendants have not submitted sufficient evidence, case authority, or legal argument, and the Court is uncertain of the factual or precise legal bases for these public policy defenses.

The Court has serious concerns regarding the lending practices utilized by Associates in this case.  However, in order to meaningfully pursue these public policy defenses, the Court would have to serve as Defendants' legal advocate by conducting detailed legal research and then constructing specific legal arguments on Defendants' behalf.  That is not this Court's role.  *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (instructing that a district court

---

[21]  For the same reasons, the Court rejects CitiFinancial's argument that the copies of Loans 1 and 3 are enforceable as a matter of law pursuant to 28 U.S.C. § 1732, which provides that a copy is admissible as an original if it has been recorded in the regular course of business by a process that "accurately reproduces" the original.  Even assuming Loans 1 and 3 were recorded in the regular course of business, the Court is not convinced, for summary judgment purposes, that accurate versions of Loans 1 and 3 were recorded and then reproduced.

"cannot take on the responsibility of serving as the litigant's attorney"). Accordingly, the Court rejects these affirmative defenses as a matter of law.[22]

B.    Breach

According to the Barbone Affidavit, "neither Frasure nor Fleming has made any payments on Loan 1 since November 28, 2000 . . . on Loan 2 since November 18, 2000 . . . [and] on Loan 3 since September 28, 1999." (Barbone Aff., Ex. E. to Mot. for Summ. J. on Loans, ¶¶ 24-26.) The Barbone Affidavit is not supported by any CitiFinancial records showing dates of payments or attempted payments. Further, CitiFinancial has not provided information as to the dates of Defendants' first missed or late payment on each loan. This would have been helpful in determining if and when Defendants were first technically in "default" on each of the loans, such that the Court could determine if CitiFinancial or Associates was entitled to refuse attempted payments.[23]

---

[22] Other "affirmative defenses" pled by Defendants, such as allegations of "bogus loans" appearing on Fleming's credit report and wrongful foreclosure actions on the Broken Arrow property, are simply not defenses to breach of contract claims. (*See* Am. Answer and Counterclaims 7, ¶¶ 5,6.)

[23] With respect to Loans 1 and 3, the "default" provision states:

I will be in default if I fail to pay any payment or part of a payment on time or if I do not keep any promises I made in this agreement or in the Real Estate Mortgage which secures my loan. In addition, if you intend to foreclose on the Real Estate Mortgage by power of sale as provided in the Oklahoma Power of Sale Mortgage Foreclosure Act, I must be given notice of my right to cure the default within 30 days from the date notice is received. If I default, you have the right to declare the entire unpaid amount of my loan immediately due and payable without giving me notice of the default or asking me to pay. . . . If you declare the balance of my loan due and payable, you have the rights and remedies provided for in the Real Estate Mortgage that secures this loan and any security agreement that may secure this loan. I may be required to pay a deficiency.

(*See* Exs. 1 and 3 to Ex. E to Mot. for Summ. J. on Loans.) With respect to Loan 2, there is not a "default" provision. There is an "acceleration" provision that provides:

CitiFinancial simply contends that, notwithstanding any of Defendants' attempted payments and notwithstanding confusion caused by errors and the constantly changing account numbers in Associates' and CitiFinancial's own correspondence, Defendants must be found in breach.

Defendants do admit that, at some point in time, they stopped making payments on the three loan agreements. (*See, e.g.*, 5/3/05 Frasure Dep., Ex. A. to Mot. for Summ. J. on Loans, at 137:11-138:8 (stopped making payment on Loan 1 a couple or more years ago), 5/24/05 Frasure Dep., Ex. D. to Mot. for Summ. J. on Loans, at 21:15-23:24 (stopped making payments on Loan 2 at unspecified time); 224:9-13 (stopped making payments on Loan 3 in August 2000).) However, Frasure informed Associates in November 2000 that she would not make further payments until she believed they would be credited to her account. Indeed, Defendants contend they stopped payment on the loans because they did not know where to send the payments for each account, and because they were not sure their payments would be credited to the correct account or credited at all. Specifically, Defendants assert:

> . . . CitiFinancial refuse to take the Defendant's money for payment and some of what the Defendant's paid CitiFinancial for payment was never document for payment, about $5,000.00 worth. . . .The Associates had modified Mr. Flemings payments so that the account's could be paid off, but the Associates never stuck to their agreement of modified payments, and put the account's in the delinquent and created new account number's which made it difficult to determine where any payment should be applied.

(*See* Doc. 93 at 1-2.) Frasure's stated rationale for the stopped payments is supported by the

---

> If any payment is not paid when due or if Borrower(s) fails to comply with any of the terms of this loan transaction, the unpaid balance of this indebtedness may at the option of the Lender become due and payable without demand or notice. If a default occurs, the Borrower(s) shall be allowed a rebate of unearned finance charges computed as set forth in the "Prepayment in Full Rebate" section.

(*See* Ex. 2 to Ex. E to Mot. for Summ. J. on Loans.)

November 15, 2000 letter drafted by Frasure stating that "I decided there was no since [sic] in me paying any more on the Realestate loan until I can be showed where my payments are being received" and requesting that someone help her. (*See* Defs.' Ex. E,25.)

As further reason for stopping their payments, Defendants argue:

> CitiFinancial had everything concerning the loan's, so messed up, that Ms. Frasure and Mr. Fleming didn't know what to believe, concerning what the Associates/CitiFinancial had done with the loan's; but can truly say, they did the best they could, to do the right thing. It was just hard to know what the right thing was, according to the way CitiFinancial dealt with Mr. Fleming and Ms. Frasure.

(*See* Doc. 94 at 11.) This assertion is supported by the timeline of correspondence set forth in detail above, in which Associates and/or CitiFinancial repeatedly referenced incorrect or unidentified account numbers, inconsistent amounts owed, and erroneous security interests in their communications with Defendants regarding Loans 1, 2, and 3. Under these circumstances, including (1) several attempted payments on the loans, some of which were returned on false or incorrect grounds, and (2) confusing, misleading, and incorrect correspondence regarding the loans, the Court finds a question of fact as to whether Defendants are in breach of Loans 1, 2, and 3. *See Wieler v. United Savings Ass'n of Texas*, 887 S.W.2d 155, 158 (Tex. App. 1994) (finding question of fact on breach of loan agreement where obligors refused to pay amount demanded because they believed it was an incorrect amount owed and because they received conflicting notices of amounts due, depriving them of their right to cure any default).

## VII.    Motion for Summary Judgment on Counterclaims

The counterclaims are pled by both Defendants. However, Fleming's deposition testimony makes clear that he has no facts supporting claims for IIED, false light invasion of privacy, defamation, or trespass, and that such claims are actually asserted only by Defendant Frasure. (*See*

33

Mot. for Summ. J. on Counterclaims at notes 1, 2, 3, and 6 and Fleming's deposition transcript references therein.)  Therefore, CitiFinancial is entitled to judgment as a matter of law on these claims as to Defendant Fleming.  Counterclaims for fraud and embezzlement are asserted by both Defendants.

> A.      CitiFinancial's Liability for Torts Committed by Associates

CitiFinancial attempts to avoid liability for conduct in which Associates engaged before CitiFinancial acquired the loans.  (*See* Mot. for Summ. J. on Counterclaims 8 ("CitiFinancial [] is not liable for the Associates' actions attempting to collect the amounts owed that preceded CitiFinancial's [] acquisition of the loans.").  The only argument offered by CitiFinancial to avoid successor liability is based on Section 3-305 of the OUCC.[24]  CitiFinancial asserts that, as a transferee of a negotiable instrument, it took Loans 1, 2, and 3 "subject only to certain limited categories of defenses and offsets" listed in Section 3-305.  CitiFinancial's argument regarding Section 3-305 is short (3 paragraphs) and was difficult for the Court to discern.  In addition, CitiFinancial did not cite any case law applying this section to relieve a transferee of liability, which would have assisted the Court.  (*See* Mot. for Summ. J. on Counterclaims 8-10.)

The Court finds CitiFinancial's reliance on Section 3-305 to be misplaced for two reasons.  First, this section is entitled "Defenses and Claims in *Recoupment*."  Section 3-305(a)(3) provides that "the right to enforce the obligation of a party to pay an instrument is subject to the following

---

[24] CitiFinancial presumably makes this argument to avoid the general rule that "tort liability of an individual, partnership or corporation is an indebtedness which may be enforced against a corporation which takes over the business and assets of its predecessor . . . as the assumption of the liabilities of a predecessor includes tort liabilities."  *See Investors Preferred Life Ins. Co. v. Abraham*, 375 F.2d 291, 294 (10th Cir. 1967) (citing *Jones v. Eppler*, 266 P.2d 451, 458 (Okla. 1953)).

*. . . a claim in recoupment against the original payee of the instrument if the claim arose from the transaction that gave rise to the instrument;* but the claim of the obligor may be asserted against a transferee of the instrument only to reduce the amount owing on the instrument at the time the action is brought." Okla. Stat. tit. 12A, § 3-305(a)(3) (emphasis added).  CitiFinancial's reliance on this provision is in error because the counterclaims asserted by Defendants are not "claim[s] in recoupment" referred to in Section 3-305.  They are offensive counterclaims for the commission of torts.  *See* 20 Am. Jur. 2d *Counterclaim, Recoupment*, *Etc.* § 5 (explaining that "recoupment . . . is a doctrine of an intrinsically defensive nature" that "allows a defendant to defend against a claim by asserting, up to the amount of the claim, the defendant's own claim against the plaintiff growing out of the same transaction" and that "the defense of recoupment is not a counterclaim or setoff").  Thus, the provision does not apply.

Second, the Court finds that Defendants' counterclaims do in fact arise "from the transaction that gave rise to the instrument" – in this case, the loans.  As explanation of this requirement, CitiFinancial relies on the commentary to the Uniform Commercial Code ("UCC"), which provides that this limitation on transferee liability is "'based on the belief that it is not reasonable to require the transferee to bear the risk that wholly unrelated claims may also be asserted.'" (Mot. for Summ. J. on Counterclaims 10 (quoting UCC § 3-305(a)(3), cmt. 3).)  However, in the Court's view, Defendants' counterclaims are not "wholly unrelated" to Loans 1, 2, and 3.  In fact, they arise directly from the loans and the relationship created by the loans.  As explained below, the counterclaims are based on threats and other taken by Associates/CitiFinancial ion attempt to "foreclose" on the Broken Arrow Home.  But for the loans, Associates/CitiFinancial would have had no belief, mistaken or otherwise, that it owned a security interest in the Broken Arrow Home.  The

Court flatly rejects CitiFinancial's argument that "[n]one of Defendants' counterclaims are related to the loans." (Mot. for Summ. J. on Counterclaims 10.)   Accordingly, the Court finds that Section 3-305 does not relieve CitiFinancial of tort liabilities committed by its predecessor, and CitiFinancial is DENIED summary judgment as to this issue.[25]   The Court has therefore considered Associates' and CitiFinancial's conduct in assessing Defendants' counterclaims.

B.   IIED

Frasure's IIED claim relates to CitiFinancial and/or Associates' repeated threats to foreclose on the Broken Arrow Home without any legal right, title, or interest therein.  (Counterclaim ¶ 8.) "Oklahoma recognizes IIED as formulated in the Restatement (Second) of Torts § 46(1) (1965), which provides: 'One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.'" *See Zeran v. Diamond Broadcasting, Inc.*, 203 F.3d 714, 720 (10th Cir. 1990).  In order to succeed on this claim, Frasure must present evidence sufficient to show that Associates and/or CitiFinancial behaved in an extreme and outrageous way toward her and that she suffered severe emotional distress as a result.  *Id.*  It is the trial court's responsibility initially to determine whether the alleged conduct may reasonably be regarded as sufficiently extreme and outrageous, *id.* (citing *Eddy v. Brown*, 715 P.2d 74, 76 (Okla.1986)), and whether the emotional distress suffered is sufficiently severe, *id.* (citing *Joffe v. Vaughn*, 873 P.2d 299, 302 n.6 (Okla. Ct. App. 1993)).  Specifically, in discussing the actions of collecting creditors, the Oklahoma Supreme Court has stated:

---

[25]   Even if the Court were to limit CitiFinancial's tort liability to actions taken after its acquisition of the loans, this would not end the inquiry as to Defendants' counterclaims.  Several of Defendants' allegations relate to conduct occurring after January 2001.

> The outrageous or extreme character of conduct required may arise from an abuse of a position or a relationship which gives the actor actual or apparent authority over another or the power to affect another's interest. *Accordingly, in specific cases, bill collectors or collecting creditors have become liable for extreme abuse of their position.* However, even in such cases, the bill collectors or creditors have not been held liable for mere insults, indignities, or annoyances that were extreme or outrageous.

*Breeden v. League Svcs. Corp.*, 575 P.2d 1374, 1377 (Okla. 1978) (emphasis added).

First, the Court concludes that the alleged conduct of Associates and CitiFinancial may be reasonably regarded as intentional and/or reckless. There is record evidence that Associates' employees made the initial August 1999 visit to the Broken Arrow Home solely for the purpose of harassment and for the purpose of scaring Frasure into returning their calls. (*See* Defs.' Ex. D,11-12 (during recorded phone conversation, Casper told Frasure, *inter alia*, that they did not actually take any pictures of the Broken Arrow Home during their visit and that "all we did was get you upset enough to call us back"). This could give rise to a finding of intentional conduct. Further, and more significantly, Frasure alleges to have informed Associates during this very first visit in August 1999 (and repeatedly thereafter) that it did not own a security interest in the Broken Arrow Home. She was correct in this assertion. And yet repeated, continuous foreclosure threats on the Broken Arrow Home continued from August 1999 until at least February 2002, when Frasure filed the Wagoner County Suit. Based on the considerable length of time that the alleged "error" persisted despite Frasure's attempts to explain and correct the situation, the Court finds that a question of fact exists as to whether the conduct was intentional or reckless.

Second, the Court concludes that the alleged conduct of Associates and CitiFinancial may be reasonably regarded as extreme and outrageous. From the initial 1999 visit to the last letter from CitiFinancial attorneys several years later, all collection efforts on the Broken Arrow Home were

wrongful and improper because CitiFinancial did not own a security interest in that home. Therefore, CitiFinancial was not merely insisting on its legal rights in a permissible way. *See Weiler v. United Savings Ass'n of Texas*, 887 S.W.2d 155159 (Tex. App. 1994) (stating that "a foreclosure sale that complies with the terms of the loan agreements and the applicable law would not justify a claim for [IIED].  Even if the creditor's conduct is extreme and outrageous, he does not commit the tort if he does no more than insist on his legal rights in a permissible way.").  Further, if these wrongful collection efforts would have occurred one time, such as the August 1999 visit, or if they would have ceased to occur once Associates/CitiFinancial was notified of the problem, the conduct would not likely be sufficient to meet the "extreme and outrageous" hurdle.  But that is not what occurred in this case.  As set forth in detail in the factual timeline above, threats of foreclosure on the Broken Arrow Home occurred for a prolonged period of time and from a variety of sources, including individuals at the Tulsa Mingo Office, individuals at CitiFinancial/Associates' national offices in Arizona and New Jersey and, most frighteningly for Frasure, from attorneys in Tulsa. Threats of foreclosure occurred even after CitiFinancial's own internal records and title searches revealed that they had no interest in the Broken Arrow Home.

What makes the conduct even more egregious is that the correspondence threatening foreclosure (on the wrong home) repeatedly referenced different and unindentifiable account numbers, different amounts owing, and different payment locations.  This made it difficult for Frasure, and even two attorneys she hired at various times, to determine how to correct the alleged "error" regarding the Broken Arrow Home.  While CitiFinancial focuses on the fact that it did not ever actually foreclose on the Broken Arrow Home, this is simply not a defense to the tort of outrage, which is meant to compensate individuals for outrageous actions that cause emotional

38

distress.  In this Court's view, it is the protracted nature of the threats of foreclosure on a wrong property, combined with ambiguous statements regarding the account numbers and unpaid amounts giving rise to the threatened foreclosure, that create a question of fact.  Further, the Court is not sympathetic to the plight of a loan company that makes so many different for-cash loans to the same individuals and takes so many different varying security interests for each that it is unable to keep the account numbers straight within its own documentation.

In addition, Frasure's deposition testimony regarding her hostile treatment by Associates' and CitiFinancial's employees and certain transcribed conversations support the Court's finding of a question of fact.  (*See, e.g.,*  5/24/05 Frasure Dep., Ex. C. to Mot. for Summ. J. on Counterclaims, at 40:13-23-50:7 (describing details of August 30, 1999 visit from Associates' employees and subsequent phone conversations with Associates' employees); *id.* at 96-106 (describing various conversations with Burnside and describing documentation sent to her by Burnside referencing an unidentifiable $65,000 loan amount); *id.* at 128:5-6) (alleging certain phone calls were stressful because she "felt [CitiFinancial was] confused" but CitiFinancial "[was]  trying to convince [her] they weren't confused"); *id.* at 139:15-21 (alleging that Associates or CitiFinancial wrongfully "force placed" insurance on her Broken Arrow Home); Defs.' Exs. L,1-L1KK (recorded conversations with Burnside).)

Although it is a high standard, the Court finds that the alleged conduct, taken as a whole, could be considered an "extreme abuse" of CitiFinancial's power to affect one of Frasure's most important interests, her home.  *See Breeden*, 575 P.2d at 1377 (stating that collecting creditors commit the tort of outrage when their conduct is an "extreme abuse" of their position of trust).  The conduct at issue went well beyond "insults, indignities, or annoyances" that a reasonable debtor must

be expected to endure. *See id.* (holding that conduct was not sufficiently outrageous where collector mailed six total letters, made several attempts to contact plaintiff by telephone, and had conversation with her in which they called her a liar and deadbeat). Instead, there were repeated threats to foreclose on the wrong property that were not accompanied with proper or specific information regarding the loan giving rise to the threatened foreclosure. This occurred despite attempts by Frasure to correct the problem. In the Court's view, this is sufficient to create a question of fact on the "extreme and outrageous" element.[26]

Finally, the Court finds Frasure's allegations of emotional distress to be sufficiently severe. Being repeatedly threatened with foreclosure on one's home is objectively stressful. This stress is compounded when the threat of foreclosure is on the wrong property. In Frasure's case, she faced the stress of losing her home and the stress of trying to straighten out the confusion that Associates/CitiFinancial created. As to the severity of Frasure's emotional distress, the record indicates that she visited Saint Francis hospital twice in September 1999 as a result of the alleged conduct occurring in August 1999. She also felt sufficiently distressed over the situation to hire an attorney to assist her on two different occasions. In addition, Frasure testified:

---

[26] The Court finds CitiFinancial's cited cases involving IIED claims based on wrongful foreclosures to be factually distinguishable. *See, e.g., Wieler*, 887 S.W.2d at 159 (granting summary judgment on IIED claim because only improper conduct was deduction of attorney fees from escrow account and there was no proof that such deduction was done recklessly or with the intent to cause emotional distress); *Heim v. California Federal Bank*, 828 A.2d 129 (Conn. App. 2003) (granting summary judgment on IIED claim where conduct consisted of filing wrongful foreclosure action because "the act of filing a lawsuit, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior"). In this case, there is evidence that the improper conduct, threatening foreclosure on the Broken Arrow Home, was intentional or reckless. Further, Frasure's claim is not based on the wrongful filing of a foreclosure action; her claim is based on the wrongful threats and actions that occurred over a prolonged period of time but never actually resulted in a foreclosure action.

40

> Well, just - just having to deal with the issues over and over and they couldn't go away.  Just constantly dealing with the same things trying to get the issues straightened out . . . .  It's like I've never had no peace since it started, because any time you have to have constantly something bearing on your mind that you know there's information floating around about your life, your assets that aren't right that have been established by paperwork . . . .

(*Id.* at 139.)[27]  The correspondence and other record evidence amply supports Frasure's allegation that she had to "deal with the issues over and over" and that she has had "no peace" for a considerable period of time regarding the Broken Arrow Home.  The Court finds that a reasonable person could conclude that Frasure suffered severe emotional distress as a result of Associates' and CitiFinancial's conduct.

C.     Defamation/False Light Invasion of Privacy

"In order to recover for defamation, a private figure must prove (1) a false and defamatory statement, (2) an unprivileged publication to a third party, (3) fault amounting at least to negligence on the part of the publisher; and (4) either the actionability of the statement irrespective of special damage, or the existence of special damage caused by the publication."  *Trice v. Burress*, 137 P.3d 1253, 1257 (Okla. Ct. App. 2006).  In order to recover on a claim for false light invasion of privacy, Frasure must prove: (1) CitiFinancial publicized a matter concerning Frasure that placed her in a false light; (2) the false light in which Frasure was placed would be highly offensive to a reasonable person; and (3) CitiFinancial had knowledge or acted in reckless disregard as to the falsity of the publicized matter.  *See Colbert v. World Publ'g*, 747 P.2d 286, 292 (Okla. 1987).  The two torts are similar but differ in the recovery sought.  Claims for false light invasion of privacy seek recovery for injury to one's own feelings, while claims for defamation seek recovery for injury to one's

---

[27] There appears to be additional testimony regarding Frasure's emotional distress at pages 141-152 that is not included in the record.  (*See id.* at 140, 153.)

reputation.  *See Zeran v. Diamond Broadcasting*, 203 F.3d 714, 719 (10th Cir. 2000).

The only allegations in the record that involve false statements made by CitiFinancial or Associates to others about Frasure are as follows:  (1) during the visit to her home in August 1999, Casper and Turley told Perry Fisher, her neighbor, that Frasure was in default on her mortgage and would be forced into foreclosure (*see* Counterclaims ¶ 15(a) and (f)); (2) CitiFinancial made statements in "public records" that Frasure was in default on her home and would be forced into foreclosure (*id.* ¶ 15(b)-(d)); and (3) Burnside allegedly told Fleming that Frasure forged his name on the loan documents and advised him to seek legal counsel regarding that forgery (*id.* ¶ 15(e); 5/24/05 Frasure Dep. at 154:22-155:11).

Even assuming Frasure could meet the first three elements of a defamation claim, the claim must fail because Frasure cannot show that she suffered "special damages" as a result of any of the alleged publications.  *See Zeran*, 203 F.3d at 718 (holding that, in absence of defamation per se, special damages are required).[28]  In her Counterclaim, Frasure alleges the defamatory actions "ha[ve] extremely damaged her life by upsetting and interfering by all aspects, in which she can never recover." (Counterclaim ¶ 18.)  As explained above in the Court's discussion of IIED, the damages Frasure alleges to have suffered are severe emotional distress and some medical expenses. Interpreting Oklahoma law, the Tenth Circuit has expressly held that emotional distress and de minimus medical expenses do not constitute "special damages" for purposes of a defamation case. *See Zeran*, 203 F.3d at 718 ("Emotional distress is not a form of special damages, and Plaintiff's de

---

[28]  The alleged publications in this case do not meet the definitions of libel per se, *see* Okla. Stat. tit. 12, § 1441; *Kleir Advertising, Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1045 (10th Cir. 1990), or slander per se, *see* Okla. Stat. tit. 12, § 1442; *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1552 (10th Cir. 1995).  Accordingly, Defendants' claim is of a type that requires pleading and proof of special damages.

42

minimus medical expenses, consisting of one visit to his physician and one prescription drug purchase, are insufficient to support the cause of action."). With respect to the "false light" claim, the Court finds that Frasure only alleges to have been placed in a "false light" to a limited number of individuals – one neighbor; her co-borrower Fleming; and the minimal number of people who viewed CitiFinancial's internal documents or Frasure's public credit reports. Any allegedly false information about Frasure being in default on her Broken Arrow Home was therefore publicized to only a small number of people, and the false light in which she was placed would not be considered "highly offensive to a reasonable person." *See Colbert*, 747 P.2d at 292. In sum, any alleged defamatory or false statements made to others regarding the wrongful security interest in the Broken Arrow Home are insignificant and not compensable as a matter of law. The significant aspect of the wrongful threats is not that they were publicized to others but that they were made to Frasure and allegedly caused her severe distress.

    D.    <u>Fraud</u>

To prove a claim for common law fraud under Oklahoma law, Defendants must prove: (1) CitiFinancial or Associates made a material representation; (2) the representation was false; (3) CitiFinancial or Associates knew the representation was false or made the representation as a positive assertion recklessly, without any knowledge of its truth; (4) CitiFinancial or Associates made the representation with the intention that it should be acted upon by plaintiff; (5) Defendants acted in reliance on the representation; and (6) Defendants suffered injury as a result of the representation. *Lillard v. Stockton*, 267 F. Supp.2d 1081, 1112 (N.D. Okla. 2003); *Whitson v. Oklahoma Farmers Union Mut. Ins. Co.*, 889 P.2d 285, 287 (Okla. 1995).

The only false representation alleged in Defendants' Counterclaim for fraud is the false

representation by Associates and CitiFinancial that they had a security interest in the Broken Arrow Home.  (*See* Am. Answer and Counterclaim ¶ 22.)[29]  CitiFinancial admits that "for a time, [] Associates mistakenly believed it had a lien on the Broken Arrow Home" and that "it communicated that mistaken belief to Defendants and to third persons."  (Mot. for Summ. J. on Counterclaims 20.)[30]  However, as correctly argued by CitiFinancial, Defendants disputed or attempted to dispute that Associates had a security interest in the Broken Arrow Home from the first time Associates' employees came to the Broken Arrow Home in August of 1999.  (*See* 5/24/05 Frasure Dep. 45:2-50:7, 128-129:5, 137:15-138:5.)  This is not a case in which Defendants relied on the false representation by acquiescing or agreeing to foreclosure.  Accordingly, their claim for fraud/deceit fails as a matter of law because they cannot show any detrimental reliance on the alleged false statements.

        E.      Trespass

        Frasure alleges that Associates and/or CitiFinancial trespassed on two occasions: the August 1999 visit regarding foreclosure on the Broken Arrow Home; and the March 2001 visit regarding repossession of a vehicle.  The Oklahoma Supreme Court has provided the following definition of trespass:

>       Trespass involves an actual physical invasion of the real estate of another without the permission of the person lawfully entitled to possession.  Stated another way, a trespasser is one who enters upon the property of another without any right, lawful authority, or express or implied invitation, permission, or license, not in the

---

[29]  Defendants have not alleged any misrepresentations made by Associates at the time of signing the loans as part of their counterclaim for fraud.

[30]  Although CitiFinancial is only willing to admit that Associates had this "mistaken belief" regarding the Broken Arrow Home, correspondence in the record makes clear that this mistake continued well after CitiFinancial acquired Associates.

performance of any duty to the owner or person in charge or on any business of such person, but merely for his own purposes, pleasure, or convenience, or out of curiosity.

*Williamson v. Fowler Toyota, Inc.*, 956 P.2d 858, 862 (Okla. 1998).

As to Associates' employees alleged trespass on Frasure's Broken Arrow property occurring in August 1999, CitiFinancial's only defense is that it has no transferee liability for the actions of Associates' employees. (Mot. for Summ. J. on Counterclaims 21.) The Court has rejected this defense as a matter of law (*see supra* 34-36), and CitiFinancial is not entitled to judgment on this aspect of the trespass claim.

As to the alleged trespass by Associates/CitiFinancial employees occurring in March of 2001, the Court finds that a question of fact exists as to whether Frasure was actually in default on Loan 2 at this time. (*See supra* at 32-33.) Therefore, there is also a question of fact as to whether CitiFinancial employees enjoyed a qualified privilege to enter the Broken Arrow property to repossesses vehicles taken as security interests for Loan 2. *See* Okla. Stat. tit. 12A, § 1-9-609; *Williamson*, 956 P.2d at 862 (stating that self-help repossession is allowed under Oklahoma law, even if it would otherwise constitute a trespass, absent a breach of the peace).

F.      Embezzlement/Conversion

Defendants' claim for embezzlement is based on allegations that certain of Defendants' payments were not credited to their loan accounts and were therefore wrongfully converted by CitiFinancial. (*See* 10/27/06 Frasure Dep., Ex. D. to Mot. for Summ. J. on Counterclaims, at 151:21-152:5.) CitiFinancial argues that a debtor/creditor relationship does not typically give rise to an embezzlement claim. *See Terry v. Water Improvement Dist. No. 5 of Tulsa Cty.*, 64 P.2d 904, 905 (Okla. 1937). The Court agrees with CitiFinancial but construes the claim as one for

conversion, which does not require proof of any particular relationship. *See Welty v. Martinaire of Okla., Inc.*, 867 P.2d 1273, 1275 (Okla. 1994) (holding that conversion is "any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein"); *see also Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (instructing district courts to construe *pro se* pleadings liberally and not to avoid granting judgment based on "confusion of various legal theories").

As explained in this Court's timeline of events, Defendants have alleged, and presented at least some supporting evidence, that they made payments that were not credited to their loan accounts. (*See* Defs.' Exs. D,33-D,50, J,7A.) Defendants' evidence also shows, however, that most of these payments were returned, either by disbursement check or by return of the actual money order, which defeats a claim for conversion. (*See* Defs.' Ex. 35,36,43,44,45,48-50 (appearing to be returned payments).) Nonetheless, with respect to any alleged payments for which Defendants can show they made payment, and the payment was not returned (*see, e.g.*, Defs.' Ex. D,33,40 and J,7A), the evidence could support a claim for conversion. Accordingly, Defendants will be allowed to put on evidence regarding this claim at trial.

## VIII.   Conclusion

CitiFinancial's Motions to Strike (Docs. 82 and 102) are GRANTED. CitiFinancial's Motion for Summary Judgment on Loans (Doc. 47) is GRANTED IN PART AND DENIED IN PART. Specifically, it is ORDERED as follows:

1.   CitiFinancial is GRANTED summary judgment on the issue of whether Frasure signed Loans 1, 2, and 3. CitiFinancial's Motion in Limine on this issue (Doc. 43) is also GRANTED.

2.      CitiFinancial is GRANTED summary judgment on the issue of whether Frasure is obligated on the loans, despite that she is not named as a "borrower" in the body of the loan documents.

3.      CitiFinancial is GRANTED summary judgment on the issue of whether the loans are void because they violate public policy.

4.      CitiFinancial is GRANTED summary judgment that the copy of Loan 2 submitted by CitiFinancial is enforceable as a lost instrument pursuant to the OUCC.  CitiFinancial is DENIED summary judgment on the same question as to Loans 1 and 3.

5.      CitiFinancial is DENIED summary judgment as to the element of breach.

CitiFinancial's Motion for Summary Judgment on Counterclaims (Doc. 72) is GRANTED IN PART AND DENIED IN PART.  Specifically, it is ORDERED as follows:

1.      CitiFinancial is DENIED summary judgment on its defense that it cannot be held liable for the actions of Associates before it acquired the loans.

2.      CitiFinancial is GRANTED summary judgment as to Defendant FLEMING on all counterclaims except Conversion.

3.      CitiFinancial is GRANTED summary judgment as to Defendant FRASURE on counterclaims for Defamation/False Light Invasion of Privacy and Fraud.

4.      CitiFinancial is DENIED summary judgment as to Defendant FRASURE on counterclaims for IIED, Trespass, and Conversion.

The parties are hereby ORDERED to attend a mandatory settlement conference, to be set as soon as possible by Magistrate Judge Paul Cleary.  This matter is currently set for a bench trial,

which means the Court will be the finder of fact.[31]  To assist settlement, the Court offers the following.  The Court warns Defendants Frasure and Fleming that they obligated themselves to these loans and received the benefit thereof.  The Court has found that CitiFinancial must offer additional proof of the terms of the loans in order to succeed in enforcing its copies, but it may well be able to do so.  Further, the Court has found a question of fact as to breach; however, even if Defendants are found not to be in breach of the agreements, that does not mean their obligations are altogether excused.  It merely means CitiFinancial may not be entitled to acceleration of and interest on the amounts due.  In other words, it is unlikely that Defendants will escape these obligations altogether. The Court also warns Frasure that, just because there is a question of fact as to her counterclaims, this does not mean she has succeeded nor does it necessarily mean she is entitled to significant damages.

Further, the Court is not impressed with CitiFinancial/Associates' lending practices, collection practices, and record-keeping practices with respect to these three loans.  Questions of fact abound in this case regarding the terms of the loans, whether Defendants actually breached the loans, and the events forming the basis of certain counterclaims.  CitiFinancial's statements of "undisputed" facts resulted in an incomplete account of what actually occurred in this case.  Some of these "undisputed" facts even appear to be contradicted by CitiFinancial's own documents that were produced by Defendants.

The stay order in this case (Doc. 97) is lifted, and the remaining deadlines are set as follows:

---

[31]  Neither CitiFinancial nor Defendants demanded a jury trial, and they have waived their right to do so.  *See* Fed. R. Civ. P. 38(b), (d); *Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992) (holding that a party waives the right to a jury trial when he fails to make a timely demand under Rule 38(b) and that pro se litigants are not entitled to any "special consideration under Rule 38").

| Deposition/videotape/interrogatory designations | October 26, 2007 |
| Counter-designations | November 12, 2007 |
| Transcripts Annotated with Objections | December 21, 2007 |
| Pretrial Order, including Final Witness and Exhibit List and Objections | December 28, 2007 |
| Trial Briefs[32] | January 9, 2008 |
| Pretrial Conference | January 7, 2008 at 11:00 a.m. |
| Non-Jury Trial | January 22, 2008 at 9:30 a.m. |

**ORDERED THIS 16th day of August, 2007.**

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**

---

[32] The Court will not allow submission of pre-trial findings of fact and conclusions of law in this case.  The Court may require such submissions afer trial.  The parties may, but are not required, to file trial briefs.