**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **CITIFINANCIAL MORTGAGE COMPANY, INC.,** ) ) ) | |
| Plaintiff, ) | |
| v. ) | Case No. 06-CV-160-TCK-PJC |
| ) | |
| **KAREN FRASURE and ALBERT FLEMING,** ) ) ) | |
| Defendants. ) | |

**AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW**[1]

The above-styled case was tried to the Court without a jury on January 23 and 24, 2008. Defendants appeared pro se, as they have throughout these proceedings, and CitiFinancial was represented by counsel. After considering the testimony and exhibits admitted at trial, the Court enters the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52:

**I.    Findings of Fact**[2]

    **A.    Background**

1.    At issue in this case are three loans made from Associates Financial Services Company of Oklahoma, Inc. ("Associates") to Defendant Albert Fleming ("Fleming"). Defendant Karen Frasure ("Frasure"), a friend of Fleming's, co-signed as a "borrower" at the bottom of all three loan

---

[1] These Amended Findings of Fact and Conclusions of Law reflect a change in the wording of Finding of Fact Number 13. Otherwise, they are identical to the Court's original Findings of Fact and Conclusions of Law.

[2] At trial, Defendants did not submit into evidence all the exhibits that Defendants submitted for purposes of summary judgment. Thus, the factual background set forth in the Court's Opinion and Order denying summary judgment ("Summary Judgment Order") is not necessarily representative of the trial evidence.

agreements.

2.      Plaintiff CitiFinancial Mortgage Company, Inc. ("CitiFinancial"), successor in interest to Associates, sued Fleming and Frasure (collectively "Defendants") to recover amounts due on the loans.

3.      On December 16, 1998, Fleming obtained a loan from Associates in the amount of $12,332.09, assigned Loan Number 0310054 ("Loan 1"). Frasure received and used the proceeds of this loan. The original monthly payment for Loan 1 was $173.52. Frasure told Fleming she would make the monthly payments for Loan 1.

4.      On the same date Loan 1 was entered, Frasure signed a mortgage in favor of Associates on property she owned in Kellyville, Oklahoma ("Kellyville Property"), which was filed of record on January 12, 1999.[3]

5.      On January 8, 1999, Fleming obtained a loan from Associates in the amount of $15,094.93, assigned Loan Number 0470088 ("Loan 2"). Frasure received and used the proceeds of Loan 2. The original monthly payment for Loan 2 was $247.49. Frasure told Fleming she would make the monthly payments for Loan 2.

6.      On the same date, January 8, 1999, Fleming obtained another loan from Associates in the amount of $132,349.15, assigned Loan Number 0310128 ("Loan 3").

7.      On the same date, January 8, 1999, Frasure executed a mortgage in favor of Associates on a home she owned in Bristow, Oklahoma ("Bristow Home"), which was recorded on January 19, 1999.

---

[3] At trial, it became clear that the property related to Loan 1 was actually located in Kellyville, Oklahoma and not in Bristow, Oklahoma, as originally stated by the Court in its Summary Judgment Order.

2

8.      A portion of the proceeds of Loan 3 – $21,000 – was used by Frasure as a down payment on a new home she purchased in Broken Arrow, Oklahoma ("Broken Arrow Home"). Another portion of Loan 3 – $81,640 – was used to pay off Frasure's original mortgage on the Bristow Home so that Associates would have first priority on the Bristow Home in the event of Defendants' default on Loan 3.

9.      On January 15, 1999, Frasure deeded the Bristow Home to Fleming. Also on January 15, 1999, Fleming gave Frasure permission to "maintain said property according to his approval." (Pl.'s Ex. 19.) Fleming and Frasure's plan was that Frasure would rent out the Bristow Home and use the rental proceeds to make the payments on Loan 3. Although Fleming was the owner of the Bristow Home, Frasure was to find the tenants, collect the monthly rent, and use the rent to make the loan payments for Loan 3. Fleming never lived at the Bristow Home but instead lived at his home in Ochelata, Oklahoma ("Ochelata Home") at all relevant times.

10.     On January 13, 1999, Frasure purchased the Broken Arrow Home. Frasure made the down payment on the Broken Arrow Home with cash generated by Loan 3 but borrowed the remainder of the purchase price from a separate mortgage company. It is undisputed that neither Associates nor CitiFinancial ever held a security interest in the Broken Arrow Home.

11.     Although all three loans were made to Fleming, with Frasure as a co-signer, the evidence shows that Fleming took out such loans for the benefit of Frasure because she could not obtain the loans on her own. The evidence also shows that Frasure agreed to be responsible for making the monthly payments on all three loans.

12.     At all relevant times, Frasure took sole responsibility for communicating with Associates and CitiFinancial regarding the loans on behalf of herself and Fleming.

13. Both Defendants appeared pro se at trial. However, Frasure was the only Defendant who presented evidence and/or witnesses at trial in defense of the claims asserted against Frasure and Fleming.[4]

### B. CitiFinancial's Claim for Breach of Loan Agreements

14. As proof of the terms of Loans 1, 2, and 3, CitiFinancial presented Exhibits 1, 6, and 10 and the testimony of the Joseph Barbone ("Barbone"), a default litigation specialist for CitiFinancial. The Court finds that such evidence is sufficient to prove the terms of Loans 1, 2, and 3, and that the copies submitted by CitiFinancial as Exhibits 1, 6, and 10 are enforceable as original copies of the loan agreements.

15. In its Summary Judgment Order, the Court denied summary judgment as to the enforceability of Loans 1 and 3 based on discrepancies in the record as to what was taken as collateral for Loans 1 and 3.[5] In its Trial Brief submitted on January 8, 2008, CitiFinancial provided the Court with authority holding that agreements regarding collateral are not considered a term of the underlying obligation to pay money and therefore ambiguities or problems related to collateral do not affect the enforceability of the underlying obligation. Because the Court finds this authority to be well founded (*see* Conclusion of Law 1), the Court's Findings of Fact do not address the ambiguities originally identified in the Summary Judgment Order as precluding enforcement of Loans 1 and 3.

---

[4] After Frasure rested her case, Fleming offered a few sentences of narrative from his seat at counsel's table.

[5] As shown in Court's Exhibit 1 and Plaintiff's Exhibit 10, the Disclosure Statements accompanying Loans 1 and 3 reference Fleming's Ochelata Home, rather than the properties upon which mortgages were executed in connection with Loans 1 and 3.

16.     As proof that Defendants are in breach of the three loans, CitiFinancial presented Exhibits 4, 7, and 12, which are Account History Reports for each account, as well as the testimony of Barbone. This evidence is sufficient to prove that Defendants have not repaid the amounts borrowed on Loans 1, 2, and 3.

17.     In its Summary Judgment Order, the Court found that questions of fact existed as to whether CitiFinancial was entitled to judgment as a matter of law to the amounts sought (which included interest and penalties) for breach of the loan agreements because, *inter alia*, (1) there was evidence that CitiFinancial had wrongfully rejected some of Defendants' payments, and (2) because Associates and CitiFinancial repeatedly sent confusing, misleading, and incorrect correspondence regarding how, to whom, and in what amounts the payments were to be made.

18.     For the first time at trial, CitiFinancial abandoned its claim for interest, late fees, or any other penalties on the three loans. Also for the first time at trial, CitiFinancial credited the accounts for Loans 1, 2, and 3 with all payments Defendants alleged to have made or attempted to make on the three accounts, including all payments identified by the Court in its Summary Judgment Order. Therefore, at trial, CitiFinancial sought only $9,245.83 on Loan 1 (*see* Pl.'s Ex. 4); $14,299.69 on Loan 2 (*see* Pl.'s Ex. 7); and $130,680.05 on Loan 3 (*see* Pl's Ex. 12). These amounts, which represent the principal amounts borrowed less payments actually received and all payments *alleged* to have been made, total $154,225.57. This total amount sought at trial is $120,367.00 less than the $274,592.57 amount originally sought by CitiFinancial in its motion for summary judgment.

19.     CitiFinancial's decision to abandon its claim for interest and penalties rendered moot many of the Court's reasons for denying its motion for summary judgment as to its claim for breach of the loan agreements. For example, the Court was unwilling to grant summary judgment in favor of

5

CitiFinancial in an amount that included interest and penalties on the loans because the evidence showed that Defendants were potentially justified in stopping payments due to confusing correspondence and wrongful refusals to credit Defendants' accounts with payments. However, because CitiFinancial no longer seeks interest or any other amounts accruing based on Defendants' delays in payment, and because CitiFinancial has credited Defendants' accounts with all payments or attempted payments identified by the Court in the Summary Judgment Order, there are no relevant facts precluding judgment in favor of CitiFinancial on the amounts sought at trial.

### C. Frasure's Counterclaim for Intentional Infliction of Emotional Distress ("IIED")

20. On August 30, 1999, Associates' employees went to the Broken Arrow Home and threatened foreclosure on that property. Frasure was present during this visit, and she informed the Associates' employees that Associates did not have a security interest in the Broken Arrow Home for any of Loans 1, 2, or 3.

21. Shannon Petrie ("Shannon"), one of Frasure's sons, lived with Frasure at the Broken Arrow Home at the time of the visit by Associates' employees in August 1999. Shannon testified that the Associates' employees screamed in the front yard, took several pictures of the house, took measurements of the house, and threatened to foreclose on the house.

22. Following this incident, Frasure contacted then Wagoner County Sheriff Ralph Curry ("Curry"). Curry testified that Frasure called him immediately following this incident to complain of trespassing and harassment by Associates. Curry went to Frasure's residence and listened to her complaints. Thereafter, Curry contacted Associates and informed them they did not have any security interest in the Broken Arrow Home.

23. Despite the fact that Frasure and Curry immediately informed Associates' employees that

they did not hold a security interest in the Broken Arrow Home, Associates and/or CitiFinancial repeatedly sent threatening foreclosure letters and repeatedly made threatening calls regarding the Broken Arrow Home.  Shannon testified that, on some occasions, they received calls from Associates and/or CitiFinancial six to ten times per day threatening foreclosure on the Broken Arrow Home and telling Frasure she needed to hire an attorney.  These threats, which took the form of phone calls and letters, occurred from August 1999 until February 2002, when Frasure finally hired an attorney and filed a civil lawsuit related to the wrongful foreclosure threats on the Broken Arrow Home.

24.     As late as September of 2001, almost two years following the incident at the Broken Arrow Home, Associates was still taking steps to foreclose on the Broken Arrow Home, including completion of a Foreclosure Analysis Checklist and Property Value Analysis Report.  (*See* Def.'s Exs. C,38 and C,49.)

25.     The relationship between Associates/CitiFinancial and Frasure is one of a creditor/debtor relationship whereby Associates/CitiFinancial had actual or apparent authority to directly and significantly affect Frasure's financial interests.

26.     Associates/CitiFinancial's conduct at issue went well beyond insults, indignities, or annoyances that a reasonable debtor might be expected to endure.  Instead, the conduct involved repeated threats to foreclose on the wrong property.  Such threats were not accompanied with proper or specific information regarding the loan giving rise to the threatened foreclosure.  A wrongful threat of foreclosure on one's home is not a mere annoyance; it is a serious and significant threat that would cause a reasonable debtor to suffer fear and concern.

27.     CitiFinancial presented no evidence at trial in an attempt to justify these wrongful threats or

explain why such threats occurred for a prolonged period of time following clear notice that it held no interest in the Broken Arrow Home.

28.     Frasure admitted during her direct examination by CitiFinancial that most if not all correspondence she received regarding the Broken Arrow Home was addressed to Fleming. She also admitted that, with respect to some of the phone calls received at her Broken Arrow Home, the caller asked to speak to Fleming and Frasure nonetheless handled the call. However, Frasure had agreed to handle all issues related to the loans for Fleming, and Frasure took responsibility for straightening out any issues related to the loans. Thus, she did not feel free to ignore the threats simply because they were directed to Fleming. Further, the crucial fact is not to whom the correspondence or call was directed but is instead what property was referenced. The property was Frasure's Broken Arrow Home. Rather than minimizing the egregiousness of Associates/CitiFinancial's conduct or the severity of Frasure's resulting distress, the use of Fleming's name on the threatening correspondence further highlights the degree of recklessness by CitiFinancial and the confusion generated by such recklessness.

29.     With respect to her emotional distress caused by the wrongful foreclosure threats, Shannon testified that Frasure was in continuous turmoil beginning in August 1999 and continuing thereafter. Shannon testified that Frasure's turmoil was increased by the fact that she tried to explain to the various callers that they did not in fact own an interest in her Broken Arrow Home, but they refused to listen to her.

30.     Frasure's pastor at certain relevant times, Robert L. Alsup ("Alsup"), testified that, sometime in 2000, he was aware that Frasure was under a great deal of stress regarding her home. He recalled that Frasure felt like her house was being taken from her and that she requested prayers regarding

the situation. He also testified that Frasure would stay up all night worrying about the threatened foreclosure and have to miss church. On at least one occasion, Alsup went to Frasure's Broken Arrow Home and prayed with her about the situation.

31.     Frasure's brother, Keith Young ("Young"), testified that Frasure was so distressed over the foreclosure threats and the harassing phone calls that she feared staying in her own home and, on occasion, spent the night at Young's home. Young also testified that Frasure was frightened and distressed by the foreclosure threats because she could not figure out what was going on and could not understand what records or loans formed the basis of such threats. As to the effect these threats had on Frasure, Young testified that Frasure has not been herself since around 2000 and that he had seen a significant change in her personality and well-being since that time.

### D.     Frasure's Counterclaim for Trespass

32.     Frasure's trespass claim is based on two occurrences of Associates employees visiting the Broken Arrow Home: (1) the August 1999 visit by Associates employees threatening foreclosure on the Broken Arrow Home; and (2) a second visit by Associates employees occurring in March 2001 regarding repossession of a vehicle that had been taken by Associates as a security interest for Loan 2. Based on the evidence at trial, including Curry's testimony, the Court finds these two instances did in fact occur.

### E.     Frasure and Fleming's Counterclaims for Conversion

33.     Defendants' conversion claims are based on instances, which are set forth in the Court's Summary Judgment Order, in which Defendants made payments that were not credited to the loan accounts. However, as explained above, CitiFinancial credited the loan accounts with any and all such alleged payments for purposes of trial.

34. To the extent any of these Findings of Fact constitute Conclusions of Law, they should be so considered.

**II.     Conclusions of Law[6]**

      **A.     <u>CitiFinancial's Claim for Breach of Loan Agreements</u>**

1. Any potential ambiguities regarding the collateral taken for Loans 1 and 3 do not preclude enforcement of the copies of Loans 1 and 3 submitted at trial. *See Assocs. Discount Corp. v. Clements*, 321 P.2d 673, 679 (Okla. 1958) (holding that a fraudulently obtained and therefore invalid mortgage did not affect enforceability of underlying obligation to pay money) ("Though the mortgage was invalid and worthless, the debt it secured was actual and enforceable"); *Anderson v. Warren*, 164 P.2d 221, 223 (Okla. 1945) ("[A] creditor holding a note secured by a mortgage may ignore his security interest and bring an action on the note. The promise to pay, as evidenced by a promissory note, is one distinct agreement. . . . while the pledge of real estate to secure that promise as evidenced by a mortgage is another distinct agreement, which is not intended to affect in the least the promise to pay, but only to provide a remedy for the failure of performance."). *Cf. Am. Bank & Trust Co. v. Bond Int'l Ltd.*, No. 06-CV-416-CVE, 2007 WL 1378595, at * 9 (N.D. Okla. May 8, 2007) (holding that a security interest in property, which was allegedly unenforceable, was not an essential part of the underlying promissory note, was severable, and did not affect the enforceability of the note) ("[S]hould the court prevent [plaintiff] from enforcing its security interest . . ., the promissory notes are still intact.").

2. Based on the Court's finding that CitiFinancial has proven the relevant terms of the

---

[6] The Court reached several relevant conclusions of law in its Summary Judgment Order. Unless contradicted by any findings of fact or conclusions of law set forth herein, conclusions of law reached at the summary judgment stage are controlling and are incorporated herein by reference.

obligations comprising Loans 1 and 3 (*see* Finding of Fact 14), and for the additional reasons set forth in the Summary Judgment Order (8/17/07 Order at 27-30), the copies of Loans 1 and 3 submitted at trial are enforceable as originals pursuant to Section 3-309 of the Oklahoma Uniform Commercial Code. *See* Okla. Stat. tit. 12A, § 3-309.

3.      Based on the Court's finding that CitiFinancial has proven that Defendants have not repaid the amounts borrowed (*see* Finding of Fact 16) and the fact that CitiFinancial seeks only the principal amounts borrowed less all payments made or alleged to have been made (*see* Findings of Fact 17-19), the Court concludes that CitiFinancial is entitled to judgment against Defendants in the total amount of $154,225.57. This amount is comprised of $9,245.83 for Loan 1; $14,299.69 for Loan 2; and $130,680.05 for Loan 3.

### B.      Frasure's Counterclaim for Intentional Infliction of Emotional Distress

4.      "Oklahoma recognizes IIED as formulated in the Restatement (Second) of Torts § 46(1) (1965), which provides: 'One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.'" *Zeran v. Diamond Broadcasting, Inc.*, 203 F.3d 714, 720 (10th Cir. 1990).

5.      "To recover damages for intentional infliction of emotional distress, a plaintiff must prove: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Computer Publications, Inc. v. Welton*, 49 P.3d 732, 735 (Okla. 2002).

6.      "The second element of this tort requires proof that the defendant's conduct was so

outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and that such conduct is regarded as atrocious and utterly intolerable in a civilized community. In general, a plaintiff must prove that the recitation of defendant's conduct to an average member of the community would arouse the listener's resentment against the defendant and would lead the listener to exclaim 'Outrageous!'" *Id.* (citation omitted). The Oklahoma Supreme Court has further explained that "[t]he outrageous or extreme character of conduct required may arise from an abuse of a position or a relationship which gives the actor actual or apparent authority over another or the power to affect another's interest." *Breeden v. League Svcs. Corp.*, 575 P.2d 1374, 1377 (Okla. 1978) (emphasis added). Collecting creditors behave in an extreme and outrageous manner if their conduct constitutes "extreme abuse of their position," but collecting creditors are ordinarily not liable for "mere insults, indignities, or annoyances that were extreme or outrageous." *Id.*

7. The fourth element, which inquires as to whether the emotional distress suffered was severe, "requires proof that the emotional distress suffered . . . was so severe that no reasonable [person] could be expected to endure it." *Welton*, 49 P.3d at 736 (quotations and citations omitted). The Oklahoma Supreme Court has further clarified the factors to consider in determining whether distress is severe:

> While emotional distress includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea, it is only where the emotional distress is extreme that liability arises. The intensity and duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed. . . . The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge."

*Id.*

8.      As to the first element, the Court concludes that Associates/CitiFinancial's prolonged failure to correct its mistake for over a two-year period regarding the Broken Arrow Home constitutes reckless conduct that gives rise to liability for IIED. Even assuming the *original* visit to the Broken Arrow Home by Associates was due to carelessness or negligence, the *continued* foreclosure threats for such a prolonged period became the result of recklessness rather than merely negligence. Based on clear notice provided by Frasure and Curry, Associates/CitiFinancial knew or should have known that it did not hold an interest in the Broken Arrow Home and should have taken whatever steps necessary to cease all threats on such property. Accordingly, the evidence at trial was sufficient to satisfy the first element and show that CitiFinancial acted recklessly in repeatedly threatening to foreclose on the Broken Arrow Home.

9.      As to the second element, the Court concludes that Associates/CitiFinancial's conduct constituted an extreme abuse of its position of authority over Frasure's interests. Their conduct involved repeatedly threatening foreclosure on a piece of property in which they had no interest, even after being informed by Curry and Frasure that they were in error. The Court can imagine no greater abuse of a creditor/debtor relationship than to wrongfully and recklessly threaten to foreclose on a person's home, when the wrongfulness and recklessness of the creditor's actions were identified and communicated to the creditor by the debtor herself. The Court further concludes that such conduct constituted extreme and outrageous behavior of a type that would anger and incense an average member of the community and cause him to exclaim "outrageous." The Court itself is angered and shocked at the events that occurred in this case over an extended period of time. CitiFinancial had the power to correct the situation and alleviate Frasure's distress and yet it failed to do so.

10. The conduct at issue is distinguishable from that at issue in *Breeden*, in which the Oklahoma Supreme Court found a collection agent's conduct to be not sufficiently outrageous. In *Breeden*, the collector mailed six total letters, made attempts to contact plaintiff by telephone, and had one conversation with her in which they called her a liar and deadbeat in an attempt to collect a valid debt. *See id.* In this case, there was a harassing visit followed by repeated wrongful threats to foreclose on Frasure's home, and the threats were not accompanied with proper or specific information regarding the loan giving rise to the threatened foreclosure. This occurred for a prolonged period of time despite attempts by Frasure to correct the problem. The facts of this case go beyond "mere insults, indignities, or annoyances that were extreme or outrageous;" the facts of this case are an example of extreme abuse of a creditor's position to affect a debtor's interests.

11. In addition, the conduct at issue in this case is distinguishable from a collecting creditor's conduct that is merely an attempt to enforce legal rights in a permissible manner. *See, e.g., Weiler v. United Savings Ass'n of Texas*, 887 S.W.2d 155, 159 (Tex. App. 1994) (stating that "a foreclosure sale that complies with the terms of the loan agreements and the applicable law would not justify a claim for [IIED]. Even if the creditor's conduct is extreme and outrageous, he does not commit the tort if he does no more than insist on his legal rights in a permissible way."). In this case, Associates/CitiFinancial had no legal right to foreclose on the Broken Arrow Home.

12. This case is also distinguishable from cases cited by CitiFinancial, in which there was no evidence that the creditor acted intentionally or recklessly, *see, e.g., Wieler*, 887 S.W.2d at 159 (granting summary judgment on IIED claim because only improper conduct was deduction of attorney fees from escrow account and there was no proof that such deduction was done recklessly or with the intent to cause emotional distress), or in which the creditor merely engaged in one

discrete wrongful act, *see, e.g., Heim v. Cal. Fed. Bank*, 828 A.2d 129, 142 (Conn. App. 2003) (granting summary judgment on IIED claim where conduct consisted of filing wrongful foreclosure action because "the act of filing a lawsuit, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior"). In this case, there is evidence that the improper conduct, threatening foreclosure on the Broken Arrow Home, was done recklessly and repeatedly for a prolonged period of time.

13.     As to the third element, the Court concludes that the evidence revealed a direct causal connection between the wrongful foreclosure threats occurring from August 1999 to February 2002 and at least *some* of the emotional distress evidenced at trial.

14.     Frasure also suffered emotional distress well after February 2002, which is when the wrongful foreclosure threats ceased. However, the Court concludes that this distress was not caused by the wrongful foreclosure attempts but was instead caused primarily by Plaintiff's *pro se* prosecution of a civil action filed in state court in 2002 and *pro se* defense of this case beginning in 2006, which proved to be stressful and difficult tasks for Frasure. Associates/CitiFinancial's wrongful foreclosure attempts were not the proximate cause of Frasure's emotional distress occurring well into 2004 and were certainly not the cause of emotional distress occurring since CitiFinancial's filing of this lawsuit in 2006. Accordingly, the Court's award of damages as to the IIED claim is based only on distress suffered during the time period of August 1999 through February 2002.

15.     As to the fourth element, which inquires as to whether Frasure's distress was severe, the Court concludes that Frasure did in fact suffer distress resulting from the wrongful foreclosure attempts. The nature and severity of such distress was evidenced by the testimony of Shannon,

Young, Shawn, and Alsup, which is discussed in Findings of Fact 29-31. The Court further concludes that Frasure's distress was so severe that no reasonable person could be expected to endure it. The intensity and duration of her distress was severe because Frasure was repeatedly barraged with phone calls and letters threatening a foreclosure on her home, when such threats had no basis in law. The threats began in 1999 with a personal visit to her home, which involved screaming and harassing behavior, and the threats did not subside until February 2002. Her distress was intensified because those making the threatening statements would not listen to her or make any efforts to investigate or correct the problem. Further, this is a case in which "the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." *Welton*, 49 P.3d at 736. It is entirely reasonable for a person to suffer severe distress over the threat of losing her home at the hands of a creditor who has no actual security interest in that home, particularly when that person has repeatedly, unsuccessfully attempted to convince the creditor that it is making a mistake. It is also reasonable for a person in Frasure's situation to fear that records were intentionally manipulated by CitiFinancial to include the Broken Arrow Home as a security interest, given CitiFinancial's behavior and continued threats of foreclosure. Therefore, the distress suffered during this time period was not exaggerated or unreasonable under the circumstances.

16.    The Court therefore concludes that Frasure has satisfied all elements of her IIED claim.

17.    With respect to an award of damages for intentional infliction of emotional distress, the Oklahoma Supreme Court has instructed:

> Expert medical testimony ordinarily is not required where damages for emotional distress are present. In most cases, jurors from their own experience are aware of the extent and character of the disagreeable emotions that may result from a defendant's outrageous conduct. *Severe emotional distress may be shown either by physical*

16

>       *manifestations of the distress or by subjective testimony.*

*Chandler v. Denton*, 741 P.2d 855, 867 (Okla. 1987) (emphasis added) (rejecting defendant's arguments that distress must be substantiated by "reasonable competent medical evidence" and that lay persons were incompetent to testify as to the plaintiff's emotional distress). The court in *Chandler* explained that "[m]uch of [the plaintiff's] anguish simply could not be measured in terms of medical expenses" and that "the very nature of the tort of outrage makes it impossible to quantify damages by reliance mainly on expert medical evidence or by a mere addition of the incurred medical expenses." *Id.*

18.     In determining a damages award, the Court has surveyed Tenth Circuit and Oklahoma cases in which juries awarded actual and/or punitive damages for IIED claims. *See, e.g., Bell v. Mickelsen*, 710 F.2d 611, 619 (10th Cir. 1983) (upholding jury award of $5000 actual damages and $25,000 punitive damages where political opponents of the plaintiff made inquiries into plaintiff's background even after learning plaintiff had been previously part of the federal witness protection program, thereby forcing plaintiff from his home and possibly endangering his life) (stating that the defendants' "conduct unconscionably invaded the plaintiff's life under the guise of political inquiry"); *Welton*, 49 P.3d at 734 (upholding jury award of $50,000 actual damages and $1,000 punitive damages where the defendant repeatedly harassed and stalked the plaintiff, with whom he formerly had a sexual relationship, after she quit her job and refused to resume the sexual relationship); *Danner v. Dillard Dep't Stores, Inc*. 949 P.2d 680, 682 (Okla. 1997) (upholding trial court's award of $30,000 actual damages where defendant filed criminal shoplifting charges against plaintiffs and such charges were not supported by evidence); *Joffe v. Vaughn*, 873 P.2d 299 (Okla. Civ. App. 1993) (upholding jury award of $2 million actual damages and $2 million punitive

damages in favor of estate of individual who had committed suicide following a termination that was based on unsubstantiated accusations of homosexual activity).

19.     In this case, the Court's award of actual damages is based on the lay testimony of Shannon, Shawn, Young, and Alsup.[7] The Court's award of damages is further based on its common-sense judgment regarding the extent and character of the disagreeable emotions that resulted from Associates/CitiFinancial's outrageous conduct in this case. The Court concludes that $50,000 is a reasonable amount of actual damages to compensate Frasure for the distress she suffered as a result of the wrongful foreclosure attempts on her Broken Arrow Home.

20.     Pursuant to Oklahoma statute, when a "jury finds by clear and convincing evidence that the defendant has been guilty of reckless disregard for the rights of others . . . the jury, in a separate proceeding conducted after the jury has made such a finding and awarded actual damages, may award punitive damages in an amount not to exceed the greater of [$100,000] or the amount of the actual damages awarded." Okla. Stat. tit. 23, § 9.1.

21.     As a general rule, and as demonstrated by the numerous cases set forth above, punitive damages are routinely awarded on IIED claims arising under Oklahoma law. In the context of an IIED claim, the Oklahoma Supreme Court has explained that "[p]unitive damages are allowed for the benefit of society as punishment" and "are designed to provide a restraint upon the transgressor

---

[7] Frasure also presented the testimony and letter (Def.'s Ex. 40) of Dr. David Wakefield ("Wakefield"), a therapist who saw Frasure a total of approximately eight times in 1999 and several other times from October 25, 2004 until December 13, 2004. However, as established by CitiFinancial on cross-examination of Wakefield, Frasure's sessions with Wakefield occurring in 1999 related to marital issues, and Wakefield does not recall discussing with Frasure any issues regarding the Broken Arrow Home during these sessions. Therefore, Wakefield's testimony is unhelpful as to damages caused by CitiFinancial/Associates during the relevant 1999-2002 time frame.

and to serve as a warning and example to the wrongdoer." *Chandler*, 741 P.2d at 868.

22. The Court concludes that $50,000 is a proper amount of punitive damages to punish CitiFinancial for its reckless conduct and to deter CitiFinancial from engaging in similar conduct in the future with respect to other customers.

### C.  Frasure's Counterclaim for Trespass

23. The Oklahoma Supreme Court has provided the following definition of trespass:

> Trespass involves an actual physical invasion of the real estate of another without the permission of the person lawfully entitled to possession. Stated another way, a trespasser is one who enters upon the property of another without any right, lawful authority, or express or implied invitation, permission, or license, not in the performance of any duty to the owner or person in charge or on any business of such person, but merely for his own purposes, pleasure, or convenience, or out of curiosity.

*Williamson v. Fowler Toyota, Inc.*, 956 P.2d 858, 862 (Okla. 1998). As to the August 1999 visit, the Court concludes that Associates had no lawful right to enter the property and that a trespass occurred. However, the Court concludes that the only damages shown at trial resulting from such trespass were emotional distress damages, which have been fully awarded by the Court to Frasure for her IIED claim. As to the March 2001 visit, the Court assumes, without concluding, that such visit constituted a trespass. Again, however, the Court concludes that the only damages shown at trial resulting from such trespass were emotional distress damages and that no further damages award is justified or supported by the evidence.

### D.  Fleming and Frasure's Counterclaims for Conversion

24. CitiFinancial credited the loan accounts with any and all payments alleged to have been made by Frasure and/or Fleming. Accordingly, Defendants did not prove any damages resulting from the alleged conversions of their payments, and Defendants are not entitled to any award of

damages on these claims.

25.     When CitiFinancial's judgment against Frasure totaling $154,225.57 is set off by Frasure's judgment against CitiFinancial totaling $100,000, CitiFinancial's judgment against Frasure totals $54,225.57.  CitiFinancial's judgment against Fleming totals $154,225.57.  Therefore, Frasure and Fleming are jointly and severally liable to CitiFinancial in the amount of  $54,225.57, and Fleming is solely liable for the remaining $100,000.

**ORDERED THIS 23rd day of May, 2008.**

_____
**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**